David J. KUKOR, Christopher A. Kukor, Glen W. Kukor, Mark Czerwinski, Renee Czerwinski, Jean Czerwinski, Jill Czerwinski, Eric Czerwinski, David Czerwinski, Dieter Czerwinski, Julie Harling, Pamela Harling, Stephanie Harling, Eric Bates, David Bates, Douglas Bates, Paulette M. Eddie, Percy E. Eddie, Lillian A. Eddie, Patrick O. Eddie, Antrice L. Eddie, Martha Swigart, Kristin Kreuzer, Richard Kreuzer II, Amalia Kreuzer, Jenny Tooley, Henry Brumirski, Terrence Brumirski, Denise Swiderski, Barbara Tibbits, Todd Tibbits, Timothy Tibbits, and Vickie Tibbits, minor residents of the City and County of Milwaukee, State of Wisconsin, by Howard B. Schoenfeld, their Guardian ad Litem, on behalf of themselves and all other children in the City and County of Milwaukee similarly situated; Cynthia Broydrick, Brian Czerwinski, Harry A. Morris, Mary J. Morris, Joseph Bates, Sharon Bates, William James, Velma James, Stephen Swigart, Frances Swigart, Richard Kreuzer, Susan Kreuzer, Russell R. Tooley, Mary Tooley, Dominik Brumirski, Arleen Brumirski, John Swiderski, Betty Swiderski, Benjamin Tibbits, and Jean Tibbits, adult residents of the City and County of Milwaukee, State of Wisconsin, on behalf of themselves and all other parents in the City and County of Milwaukee similarly situated; Lois Riley, Margaret Dinges, Michael Elconin,

469

Gerald P. Farley, Stephen Jesmok, Jr., Peggy Kenner, James F. Koneazny, Marian McEvilly, Edward S. Michalski, Lawrence J. O'Neil, Lorraine M. Radtke, Doris Stacy, Leon W. Todd, Jr., Henry W. Maier, Roy B. Nabors, John R. Kalwitz, Sandra Hoeh, Kevin D. O'Connor, Rod Lanser, Ben E. Johnson, Robert M. Weber, Wayne P. Frank, James Kondziella, Betty Voss, Joan Soucie, Clifford A. Draeger, Robert L. Spaulding, and Gregory G. Gorak, as taxpayers and residents of Milwaukee, Plaintiffs-Appellants,†

Rochelle BETHIA, James Blask, Jennifer Giradot, Debbie Narloch, Kevin O'Connell, and Daniel Walsh, minor residents of the West Allis-West Milwaukee and City of Wauwatosa School Districts, Cities of West Allis, West Milwaukee, and Wauwatosa, State of Wisconsin, on behalf of themselves and all other children in the state similarly situated; Ilsa Ehlert, Robert A. Giaeck, Philip Jrolf, Paule A. Kolff, Craig Larson, Michael J. Piasecki, and Lois Weber, adult residents of the West Allis-West Milwaukee and City of Wauwatosa School Districts, Cities of West Allis, West Milwaukee, and Wauwatosa, State of Wisconsin, on behalf of themselves and all other taxpayers in the state similarly situated; Gordon J. Bethia, James F. Blask, David A. Giradot, Catherine Narloch, Joyce O'Connell, and Roger Walsh, adult residents of the West Allis-West Milwaukee and City of Wauwatosa School Districts, Cities of West Allis, West Milwaukee, and Wauwatosa, State of Wisconsin, on behalf of themselves and all other parents in the state similarly situated, Plaintiffs-Intervenors-

† Motion for reconsideration denied April 12, 1989, with $50 costs.

Appellants,

v.

Herbert GROVER, Wisconsin Superintendent of
Public Instruction, Wisconsin Department of
Public Instruction, Charles P. Smith, Treasurer
of the State of Wisconsin, W. Michael Ley,
Secretary of the Wisconsin Department of
Revenue, and Wisconsin Department of
Revenue, Defendants-Respondents.

Supreme Court

*No. 86–1544. Argued November 1, 1988.—Decided February 22, 1989.*

(Also reported in 436 N.W.2d 568.)

472

For the plaintiffs-appellants there were briefs by *Alan Marcuvitz* and *Howard B. Schoenfeld*, attorneys, and *Fiorenza & Hayes, S.C.*, of counsel, all of Milwaukee, and oral argument by *Mr. Marcuvitz* and *Mr. Schoenfeld.*

For the defendants-respondents the cause was argued by *Daniel D. Stier*, assistant attorney general, with whom on the brief was *Donald J. Hanaway*, attorney general.

Amicus curiae briefs were filed by *Bruce Meredith,* Madison, for Wisconsin Education Association Council; and *Michael J. Julka, Jean M. Williams,* and *Lathrop & Clark,* Madison, for Wisconsin Association of School Boards, Inc.

LOUIS J. CECI, J.   This case is before the court on certification from the court of appeals, pursuant to sec. (Rule) 809.61, Stats., and is an appeal from a judgment of the circuit court for Dane county, William C. Sachtjen, reserve circuit judge, dismissing the appellants' complaint. The issue presented concerns the constitutionality of the statutory school finance system set forth under ch. 121, Stats. The constitutional challenge consists of two prongs. First, appellants assert that the system of school finance is unconstitutional for the reason that it fails to meet the requirement of art. X, sec. 3 of the Wisconsin Constitution that "[t]he legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable ...." Second, appellants assert that the school finance system is unconstitutional because it violates the equal protection provision of art. I, sec. 1 of the Wisconsin Constitution. The circuit court determined that the finance system survived both challenges and, consequently, entered a judgment dismissing the complaint. We affirm the judgment of the circuit court.

We commence our analysis by summarizing the statutory scheme under consideration. The general public school finance scheme of equalization has remained in principal part substantially the same as the system existed when addressed by this court in *Buse v. Smith,* 74 Wis. 2d 550, 247 N.W.2d 141 (1976). Those changes to ch. 121, Stats., which are relevant to certain

of the challenged deficiencies in the school finance system will be discussed, where appropriate, below.

Schools in Wisconsin are funded by a combination of state, local and, to a lesser extent, federal funds.[1] The state share of the cost of public education consists of equalization aid and categorical grants. Equalization aid, distributed under the state general aid formula, distributes the largest proportion of state aid,[2] and it is this formula that is challenged in the present action. The purpose underlying the current statutory equalization formula is as follows:

> It is declared to be the policy of this state that education is a state function and that some relief should be afforded from the local general property tax as a source of public school revenue where such tax is excessive, and that other sources of revenue should contribute a larger percentage of the total funds needed. It is further declared that in order to provide reasonable equality of educational opportunity for all the children of this state, the state must guarantee that a basic educational opportunity be available to each pupil, but that the state should be obligated to contribute to the educational program only if the school district provides a program which meets state standards. It is the purpose of the state aid formula set forth in this subchapter to cause the state to assume a greater proportion of the costs of

[1] In the 1985–86 school year, complete actual school costs per pupil were distributed as follows: federal share, 4.68%; state share, 36.07%; local share, 59.25%. In Milwaukee, the distribution of school costs for the same school year was as follows: federal share, 8.63%; state share, 47.24%; local share, 44.13%. Basic Facts (1986–87), Wisconsin Department of Public Instruction, at C–9.

[2] In the 1985–86 school year, 902,699,034 of the 1,142,465,323 dollars of state school aid was distributed as equalization aid. Basic Facts, *supra,* at A–6, A–7.

public education and to relieve the general property of some of its tax burden.

Section 121.01, Stats.[3] The state general aid formula responds to the articulated purpose by providing for equalization of the property tax bases up to a certain level. The operation of the general state aid formula may be broadly explained as follows:

> The local tax base available for the education of each child may be determined by dividing the district's equalized valuation by its membership. The resulting equalized valuation per member varies widely, from a low of $77,927 to a high of $988,561 for districts offering grades kindergarten through 12 in [1985–86]. Obviously, if the local tax base provided the only source of revenue available to the local school district, the quality of education would likely vary widely among schools, depending on the ability of each district to raise sufficient property tax for operation of the schools.
>
> The state general aid formula provides for *equalization* of the property tax base. A tax base of $270,100 [in 1985–86] is guaranteed to support education costs for each pupil in K–12 districts. If the district tax base falls below that amount, the state general aid formula supplements the local tax base up to the guaranteed tax base level.

Basic Facts (1986–87), Wisconsin Department of Public Instruction, at D–1 (emphasis in original) [hereinafter Basic Facts]. The equalization formula consists primarily of two levels of sharing: primary and secon-

---

[3]Throughout this opinion, unless otherwise noted, all statutory citations refer to the 1987–88 Wisconsin Statutes.

dary school costs.[4] The primary shared cost is the amount of a district's costs which is less than the primary ceiling cost determined by the legislature, and the secondary shared costs are those costs which exceed the ceiling.[5] The extent to which the state contributes to the shared costs depends upon the difference between the property value of each district (the "equalized valuation") and the guaranteed valuation. *See* sec. 121.08, Stats. The equalized valuation is the full value of the taxable property in a school district. Sections 121.004(2) and 121.06, Stats. The primary guaranteed valuation per member is based upon the appropriation for general equalization aids, sec. 121.07(7)(a), Stats., and is higher than the secondary guaranteed valuation per member which equals 106% of the state's actual average equalized valuation.[6] Guaranteed valuation is

---

[4]Section 121.07, Stats., provides in part as follows:

(6) Shared cost. (a) "Shared cost" is the sum of the net cost of the general fund and the net cost of the debt service fund. The net cost of the debt service fund included in shared cost may not exceed an amount equal to $90 multiplied by the membership.

(b) The "primary ceiling cost per member" shall be $3,860 in the 1987-88 school year and $4,090 in each school year thereafter, except as provided in s. 121.23.

(c) The "primary shared cost" is that portion of a district's shared cost which is less than the primary ceiling cost per member multiplied by its membership.

(d) The "secondary shared cost" is that portion of a district's shared cost which is not included in the primary shared cost.

[5]*Id.* The current primary ceiling cost is an amount determined by the legislature. Section 121.07(6)(b), Stats. Prior to the 1987 Act 27 amendment to sec. 121.07(6)(b), the primary ceiling cost was calculated as 110% of the state average cost per pupil. Section 121.07(6)(b), Stats. (1985-86).

[6]Section 121.07(7), Stats., provides as follows:

Guaranteed valuation per member. (a) The "primary guar-anteed valuation per member" is an amount, rounded to the next

determined by multiplying these amounts by the number of pupils enrolled in the respective districts. *See* sec. 121.004(7), Stats. (definition of pupils). As we observed in *Buse,* the lower secondary guaranteed valuation serves as a "built-in disincentive" against spending above the primary shared cost ceiling. 74 Wis. 2d at 558.

Where the primary guaranteed valuation exceeds the equalized valuation, this difference is multiplied by the primary required levy rate to determine primary state aid. Section 121.08, Stats. The primary required levy rate, or mill rate, is the primary shared cost divided by the primary guaranteed valuation, with both figures computed as explained above. Section 121.07(10)(b), Stats. Simply stated, the required levy rate is determined by dividing the amount of money which needs to be received by the guaranteed value of the property to be taxed. Where shared costs exceed the primary cost ceiling, the difference between the secondary guaranteed valuation and the equalized valuation is multi-

lowest dollar, that, after subtraction of payments under ss. 118.153(4)(b), 121.09 and 121.85(6)(b)2 and 3 and (c), fully distributes the amount remaining in the appropriation under s. 20.255(2)(ac) for payments under ss. 121.08, 121.10, 121.105, 121.135, 121.85(6)(a) and (g) and 121.86(2).

(b) The "secondary guaranteed valuation per member" shall be an amount rounded to the next lowest dollar determined by multiplying the equalized valuation of the state by 1.06 and dividing the result obtained by the state total membership.

This formula may vary where a district operates only high school or only elementary grades:

(c) For districts operating only high school grades, the amounts in pars. (a) and (b) shall be multiplied by 3 and rounded to the next lowest dollar.

(d) For districts operating only elementary grades, the amounts in pars. (a) and (b) shall be multiplied by 1.5 and rounded to the next lowest dollar.

plied by the secondary required levy rate to determine secondary aid. Section 121.08, Stats. The secondary required levy rate is computed by dividing the secondary shared cost by the secondary guaranteed valuation. Section 121.07(10)(c), Stats. This formula may be illustrated as follows:

$$\text{General State Aid} = \frac{\text{Primary Shared Cost}}{\text{Primary Guaranteed Valuation}} \times$$

$$(\text{Primary Guaranteed Valuation} - \text{Equalized Valuation})$$

$$+ \frac{\text{Secondary Shared Cost}}{\text{Secondary Guaranteed Valuation}} \times (\text{Secondary}$$

$$\text{Guaranteed Valuation} - \text{Equalized Valuation})$$

For the purpose of clarification, we borrow from certain of the examples presented during the trial of this case by a witness from the Wisconsin Department of Public Instruction (DPI). The following three examples explain the effect of variations in property wealth on districts' entitlement to equalization aid, assuming that districts tax at the required levy rate: (1) A district whose tax base (equalized valuation) exceeds the primary guaranteed tax base (primary guaranteed valuation) receives no equalization aid;[7] (2) a district whose tax base is 37% of the primary guaranteed tax base will pay 37% of the costs which do not exceed the primary cost ceiling; and (3) a district whose tax base is 66.7% of the primary guaranteed tax base will pay 66.7% of the costs which do not exceed the primary ceiling. Because the secondary guaranteed tax base is always lower than

[7] The statistics reprinted in Basic Facts, *supra* p. 476, at D-6-D-16, demonstrate that several wealthy school districts such as Nicolet, Wauwatosa, and Whitefish Bay did, in fact, receive no equalization aid in 1985-86 as a result of the general aid formula.

the primary guaranteed tax base, districts must pay for a proportionally greater amount of the costs that exceed the primary ceiling cost. Furthermore, the secondary cost calculation may operate to reduce primary aid where a district has a high per-pupil cost and high equalized property valuation. Section 121.08(2), Stats. For example, in the example given by the DPI witness and recapitulated above, where the school district's tax base was 66.7% of the primary guaranteed tax base, the tax base exceeded the lower secondary guaranteed tax base by 20%. In such an instance, the state's share of the costs exceeding the primary ceiling would be −20%. Therefore, although with the figures utilized in this example the district would be entitled to receive 33.3% of its primary costs from the state, or $916, under the first part of this calculation, that amount would be reduced by $150, representing 20% of $750, which constituted secondary costs. However, "[i]n no case may the aid under this section be less than zero." Section 121.08(2). Of course, at the time that *Buse* was before this court, the school aid formula could result in "negative aid" or the payment of a portion of a district's property tax revenue to the state. This negative aid component of the school finance system was declared unconstitutional in *Buse* as a violation of the constitutional uniform taxation requirement. Wis. Const. art. VIII, sec. 1.

As to this system, it may generally be observed that resources are allocated on the basis of ability to raise revenue from the districts' property tax base. Thus, all districts may be assured that if they spend at the same level per member, they may tax at the same rate regardless of property valuation differences. *See generally* Basic Facts, *supra* p. 476 at D–3.

The appellants maintain that the unconstitutional deficiency in the system is that the school finance program fails to take into account the fact that children have differing educational needs, some of which may, as a result of socioeconomic factors, require greater financial resources to achieve the same level of educational opportunity. It is further argued that those districts with the greatest educational burden are the least capable of raising sufficient financing from property taxation as a result of lower property valuations or "municipal overburden" placing greater tax demands upon the property.

The deficiencies presented by appellants in support of the argument that the method of school finance is unconstitutional specifically include the following. First, appellants discuss the failure of the finance system to compensate for the "educational overburden" resulting from a high concentration of poverty students and concomitant financial burden of providing for the following services more greatly needed in poverty districts: early childhood education; compensatory education; dropout prevention programs; vocational education; and supportive services, including the provision of social workers and psychologists. It is asserted that the need to provide programs to compensate for poverty effects on education has required the redirection of funds from regular programs and, consequently, an inability to provide regular programs of instruction equal to those of higher expenditure districts. Additionally, appellants allege deficiency in the system's failure to compensate for "municipal overburden." Municipal overburden is a term used to describe the circumstances of high municipal service needs and costs and resultant high property tax rates which preclude increases in revenue for school purposes. Related to the

481

general argument regarding municipal overburden is the more specific factor of high costs of education in metropolitan districts due to higher labor costs; security and vandalism costs; and high maintenance and energy costs because of older school buildings. Finally, appellants argue that the disparities in per-pupil expenditures among districts are demonstrative of the deficiency in the operation of the current school finance system.

This court, in reviewing the trial court's findings of evidentiary or historical fact, will uphold those findings unless they are clearly erroneous. *Treiber v. Knoll,* 135 Wis. 2d 58, 64, 398 N.W.2d 756 (1987). We heed to this deferential standard in the present case and uphold the following findings of the circuit court. We note, however, that subsequently enacted legislation may have alleviated certain burdens.

1. "The record in this case clearly shows that districts with a high concentration of poverty students face an educational overburden in the area of early childhood education."

2. "The evidence also shows that districts with a high concentration of poverty students face an extraordinary educational burden in the important area of compensatory education."

3. "The record does show that districts with a high concentration of poverty students face an educational overburden in the area of dropout prevention programs for high-risk youth."

4. "Districts with a high concentration of poverty students unquestionably face an educational overburden in the area of vocational education."

5. "While districts may deploy various personnel in different ways to attempt to meet the needs of poverty students, the evidence presented at trial

particularly emphasized the supportive services overburden as it impacts upon social workers, psychologists and nurses."

6. "The results of insufficient categorical aids is that local revenues absorb much of the costs of these programs and acts as a drain on local district resources."

7. "There are wide disparities in operating expenditures among Wisconsin school districts."

8. "[N]on-school tax burdens make it difficult for Milwaukee taxpayers and those in other municipally overburdened jurisdictions to increase property taxes to provide appropriate educational programs for pupils ...."

9. "[T]he cost of education is higher in the metropolitan districts in the state." In this regard, the trial court discussed high salary costs, security and vandalism costs, and high costs due to the operation of school in old structures.[8]

---

[8]The dissent discusses the circuit court's findings as the bulwark of its position that the school aid formula is unconstitutional. The facts found by the circuit court demonstrate deficiencies which existed in the formula, which may arguably, to some extent, remain. However, the fact that deficiencies may exist is not the equivalent of a constitutional infirmity. Accordingly, after the circuit court's detailed discussion of the deficiencies it acknowledged to exist, the circuit court concluded that the problems attendant to the implementation of the formula were not of constitutional magnitude such as to warrant judicial intrusion upon the legislative decision-making process intimately implicated in the school aid formula. Specifically, the circuit court ultimately found most significant the fact that the school aid is distributed on a uniform basis and concluded that "[w]hether a higher degree of uniformity is now 'practicable' is for the Legislature to decide.... The battle over scarce tax dollars for education is a political one.... The Legislature is where the framers of the constitution intended these decisions to be made."

## I. *Uniformity Provision of art. X, sec. 3*

Article X, sec. 3 of the Wisconsin Constitution provides in part as follows:

> The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years ....

It is appellants' position that the school finance system fails to meet the constitutional uniformity requirement since the system does not respond to the fact that districts experiencing educational overburden have the most limited educational resources and, consequently, expend substantially less per pupil than do more affluent districts. More generally stated, appellants assert that because art. X, sec. 3 requires uniformity in educational opportunities, the school finance system which operates as a function of property valuation, as opposed to educational needs, is in contravention of the uniformity provision.

Respondents assert that appellants are challenging a determination of the degree to which uniformity is "practicable" and, consequently, addressing a question which is within the exclusive province of the legislature. Additionally, respondents maintain that the degree of uniformity sought by appellants in this action is inconsistent with the concept of "local control" rooted in art. X of the Wisconsin Constitution.

We have reviewed the constitutional debates and are convinced, upon such readings and upon consideration of art. X, sec. 3 in the context of the related provisions of art. X, that the present system of school finance is not inconsistent with the uniformity provi-

sion of art. X. The analysis applied to arrive at this conclusion regarding the interpretation of art. X, sec. 3 is structured upon a framework previously established and applied in *Buse.* 74 Wis. 2d at 568. This court will consider the following in a question of constitutional interpretation:

(1)   The plain meaning of the words in the context used;

(2)   The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution, *see State ex rel. Zimmerman v. Dammann* (1930), 201 Wis. 84, 88, 89, 228 N.W. 593, and *State ex rel. Comstock* [*v. Joint School District,* 65 Wis. 631, 636, 27 N.W. 829 (1886)]; and

(3)   The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution. *Payne v. Racine* (1935), 217 Wis. 550, 259 N.W. 437.

*Id.*

Precisely what the framers intended by the phrase "as nearly uniform as practicable" is not evident from the plain meaning of these words. This court has on previous occasions been presented with the question of the framers' intent underlying art. X, sec. 3. However, while this court has in prior cases whittled away from the uniformity provision that which was not intended, the question of whether this section mandates that resources be allocated such as to guarantee that each district operates with sufficient resources to assure equality of opportunity for education in the sense of responding to the particularized educational needs of each child has not been previously addressed.

485

This court has, in several cases, discussed art. X, sec. 3 in the context of the formation and organization of school districts.

> An examination of the debates in the conventions that framed our present constitution and the constitution of 1846 (which contained a similar provision) discloses that the members of those conventions, when they were framing the article relating to schools, were concerned, not with the method of forming school districts, but with the character of instruction that should be given in those schools after the districts were formed, —with the training that these schools should give to the future citizens of Wisconsin.
>
> Viewing the terms of this constitutional provision in the light of its express terms as well as of the purpose which actuated those who drafted it, *we conclude that the requirement as to uniformity applies to the districts after they are formed, —to the character of the instruction given, —rather than to the means by which they are established and their boundaries fixed.*

*State ex rel. Zilisch v. Auer,* 197 Wis. 284, 289–90, 223 N.W. 123 (1928) (emphasis added). The court has adhered, in an unwavering line of cases, to the proposition that it is the "character" of district schools as opposed to the method of forming school districts as to which art. X, sec. 3 applies. *See, e.g., Larson v. State Appeal Board,* 56 Wis. 2d 823, 202 N.W.2d 920 (1973); *Joint School District v. Sosalla,* 3 Wis. 2d 410, 88 N.W.2d 357 (1958). However, these cases which limit the application of art. X, sec. 3 to considerations of uniformity regarding "character" of instruction do not define that which pertains to such "character" and are,

accordingly, of limited interpretive value in the present instance.

This court's decision in *Buse* approached the uniformity provision in a more closely related question. In *Buse,* the negative aid provision of ch. 121 was challenged and declared unconstitutional as violative of the uniform taxation provision of art. VIII, sec. 1. The court discussed art. X, sec. 3 to determine whether the uniformity provision mandated the type of uniformity accomplished by means of the negative aid provision, which had the effect of shifting property wealth from wealthy to less affluent districts. The court rejected an interpretation of art. X, sec. 3 which would require absolute uniformity in education.

> Whether absolute uniformity of an equal opportunity for education in all school districts of the state is socially desirable, is not for this court to decide. We can only conclude that the plain meaning of sec. 3, art. X does not mandate it.
>
> * * *
>
> We cannot agree with the contention of the respondents that the mandate in art. x, sec. 3, especially when read in conjunction with the other provisions of art. X, requires that revenue raising powers of the school districts must be equalized in the manner prescribed by secs. 121.07 and 121.08, Stats. [1975].

74 Wis. 2d at 568, 570. Appellants maintain that *Buse* is not determinative of the present case because the *Buse* holding only precludes an interpretation of the uniformity provision which would limit the right of districts to raise and spend funds beyond those expended by other districts, whereas the case at bar presents

487

the question of a constitutionally mandated reduction of disparities in educational opportunities to assure that the educational needs of children at the "lower end of the spectrum" are met. We agree that *Buse* is not determinative in this matter, but disagree that the fundamental concept of the state-locality relationship in school financing does not apply with equal strength as to the present issue.

Having determined that the plain meaning of the constitutional uniformity provision is not evident and that this court's previous decisions have not resolved the precise question as to this provision before the court today, we turn to debates of the constitutional convention for guidance. *See Buse,* 74 Wis. 2d at 568 (citing *State ex rel. Zimmerman v. Dammann,* 201 Wis. 84, 89, 228 N.W. 593 (1930)). There is no question that the adoption of art. X of the 1848 Wisconsin Constitution represented recognition by the framers that public education was a function of the state. During the constitutional convention of 1847–48, more debate attended the issue of the extent of, as opposed to the question of, the state's participation in the funding of public schools. In a debate regarding whether the funds from the land grants from the United States government should be applied to the establishment of a school fund, it was stated by a member of the general committee on education that appropriation of the fund to public schools was necessary, since "[a] general system of education was the only system on which we could depend for the preservation of our liberties." Journal and Debates, Constitutional Convention, at 238 (1847–48) [hereinafter Journal and Debates]. While the state's role of supporting schools by means of the school fund was deemed crucial, at no point was the

state's function regarded as requiring the complete support of public schools:

> The committee on education and school funds ... had not, in any of the plans which had received favorable consideration at their frequent consultations, contemplated providing a fund, the revenues of which would afford the whole means of educating the children and youth of the state. On the contrary, they proposed to give the people a direct pecuniary interest in the support of their schools by calling upon them to contribute at least one third of the amount required for their sustenance, by direct taxation.

*Id.* at 236. More specifically, it was observed:

> It was intended that whatever the amount of the school fund might be, one-third of the expense of supporting schools, should be borne by each town. If a sufficient sum was not contributed by the school fund, the towns should have power to raise more. This provision was directly for the advantage of the poor. The gentleman who had last spoken, might not appreciate this; but a poor man with a family of children, and no fancy lots to dispose of, could understand the advantage. Experience had shown that if nothing was contributed by the town, the common schools languished, and select schools rose on their ruins. The school fund of Connecticut was so large as to be sufficient to defray the expenses of the education of every child within the limits of the state. Yet there, until a year or two, the district school system had declined. No adequate interest was felt by the people, in common schools, unless they contributed to their support. To obviate this danger, the committee had inserted the section.

*Id.* at 335 (*quoted in Buse,* 74 Wis. 2d at 570–71). *See also id.* at 344. Interestingly, the framers expressed no concern as to the adequacy of the school fund to support the schools, and in fact it was opined that "there would be an excess above the wants of the primary and common schools." *Id.* at 342. Since the framers believed the school fund would be more than adequate to support the state's share of the educational cost burden, the provisions made as to the distribution of these funds is conclusively indicative of the framers' view of that which would constitute an equitable division of the state's resources to the districts.

The fact that the primary source of the state's share of school funding is now from general revenue as opposed to the school fund does not deflect from the significance of the constitutional provision for the distribution of state resources.[9] Significantly, the first

[9]*See, e.g.,* secs. 24.76–78, 43.70(1)–(3), Stats. Section 43.70(2) provides for the constitutionally mandated distribution of school funds:

> Annually, within 40 days after December 1, the state superintendent shall ascertain the aggregate amount of all moneys received as income in the common school fund prior to that December 1 and shall apportion such amount to the school districts in proportion to the number of children resident therein between the ages of 4 and 20 years, as shown by the census report certified under sub. (1).

The school fund resources are currently expended as follows:

> All moneys apportioned from the common school fund shall be expended for the purchase of library books and other instructional materials for school libraries, but not for public library facilities operated by school districts under s. 43.52, in accordance with rules promulgated by the state superintendent.

Section 43.70(3), Stats. The school fund is separate from resources appropriated under sec. 20.255, Stats., from general purpose revenues.

law enacted for a state tax for the production of revenues for school purposes provided that the funds collected be disbursed in the same manner as provided for the disbursement of common school fund income. 1885 Laws of Wisconsin, ch. 287. At the very least, it cannot be stated that a scheme of financing which distributes funds in a manner more responsive to wealth disparities than the constitutional provision for the school fund does not meet the art. X, sec. 3 uniformity provision. That method of distribution of state resources for public schools deemed equitable, and necessarily meeting the uniformity provision of art. X, sec. 3, was set forth under art. X, sec. 5, as follows:

> *Provision shall be made by law for the distribution of the income* of the school fund among the several towns and cities of the state for the support of common schools therein, *in some just proportion to the number of children and youth resident therein* between the ages of four and twenty years, and no appropriation shall be made from the school fund to any city or town for the year in which said city or town shall fail to raise such tax; nor to any school district for the year in which a school shall not be maintained at least three months.

(Emphasis added).[10]

---

[10]Article IX, sec. 2 of the constitution adopted at the 1846 constitutional convention, which was not ratified, provided as follows:

> *Provision shall be made by law for an equal and equitable distribution of the income* of the state school fund amongst the several towns, cities, and districts, for the support of schools therein respectively, *in some just ratio to the number of children* who shall reside in the same, between the ages of five and sixteen years inclusive.

(Emphasis added.)

The present equalization system far exceeds the degree of uniformity which might be accomplished under the constitutional provision: whereas the constitution provides only for each district to receive an equal amount of state resources per pupil, ch. 121, Stats., provides a greater amount of state funds per pupil to districts with lower equalized property valuations. The general aid formula operates to assure that all districts will be able to provide for the basic education of its pupils, regardless of property wealth, at a cost slightly higher than the average state cost per pupil of the previous year. (*See* discussion *supra* n. 5 regarding changes in primary ceiling cost.) As explained above, to the extent that the needs of a district exceed that cost ceiling, in addition to categorical grants, supplemental "secondary aid" may be available to districts with relatively low property valuation.

Consequently, while greater uniformity in educational opportunities is, in the opinion of both parties, desirable and necessary, it is not something which is constitutionally mandated under the uniformity provision. The framers unequivocally and specifically provided for a mode of distribution of state funds to districts in other sections of art. X; the uniformity provision thus could only have been intended to assure that those resources distributed equally on a per-pupil basis were applied in such a manner as to assure that the "character" of instruction was as uniform as practicable. Viewed in this regard, the "character" of instruction which is constitutionally compelled to be uniform is legislatively regulated by sec. 121.02, Stats., regarding, for example, minimum standards for teacher certification, minimal number of school days, and

standard school curriculum.[11] The state assures compli-

[11]Section 121.02 provides in part as follows:

**School district standards. (1)** Each board shall:

(a) Ensure that every teacher, supervisor, administrator and professional staff member holds a certificate, license or permit to teach issued by the department before entering on duties for such position.

(b) Annually, establish with school board employes a professional staff development plan designed to meet the needs of individuals or curriculum areas in each school.

(c) Provision shall be made for remedial reading services for under-achieving students in grades kindergarten through grade 3.

(d) Operate a 5–year-old kindergarten program, except in union high school districts.

(e) Provide guidance and counseling services.

(f) 1. Schedule at least 180 school days annually, less any days during which the state superintendent determines that school is not held or educational standards are not maintained as the result of a strike by school district employes.

2. Annually, schedule at least 437 hours of direct pupil instruction in kindergarten, at least 1,050 hours of direct pupil instruction in grades 1 to 6 and at least 1,137 hours of direct pupil instruction in grades 7 to 12. Scheduled hours under this subdivision include recess and time for pupils to transfer between classes but do not include the lunch period.

(g) Provide for emergency nursing services.

(h) Provide adequate instructional materials, texts and library services which reflect the cultural diversity and pluralistic nature of American society.

(i) Provide safe and healthful facilities.

(j) Ensure that instruction in elementary and high schools in health, physical education, art and music is provided by qualified teachers.

(k) 1. By September 1, 1988, develop a written, sequential curriculum plan in at least 3 of the following subject areas: reading, language arts, mathematics, social studies, science, health, computer literacy, environmental education, vocational education, physical education, art and music. The plan shall specify objectives, course content and resources and shall include a program evaluation method.

ance with these standards by providing for the imposition of sanctions upon districts found not to be in compliance. *See* sec. 121.02(2), Stats. The appellants have not asserted that due to the distribution of school aid under the equalization formula, their districts are unable to meet these standards, and there was testimony by appellants' witnesses that basic educational programs had in fact improved. Consequently, we hold that the school finance system as set forth in ch. 121, Stats., does not unconstitutionally impinge upon the uniformity requirements of Wis. Const. art. X, sec. 3.

2. By September 1, 1989, develop a written, sequential curriculum plan in at least 3 additional subject areas specified in subd. 1.

3. By September 1, 1990, develop a written, sequential curriculum plan in all of the remaining subject areas specified in subd. 1.

(L) 1. In the elementary grades, provides regular instruction in reading, language arts, social studies, mathematics, science, health, physical education, art and music.

2. In grades 5 to 8, provide regular instruction in language arts, social studies, mathematics, science, health, physical education, art and music. The school board shall also provide pupils with an introduction to career exploration and planning.

3. In grades 9 to 12, provide access to an educational program that enables pupils each year to study English, social studies, mathematics, science, vocational education, foreign language, physical education, art and music. In this subdivision, "access" means an opportunity to study through school district course offerings, independent study, cooperative educational service agencies or cooperative arrangements between school boards and postsecondary educational institutions.

(m) Provide access to an education for employment program that has been approved by the state superintendent.

[Par. (m) was created by 1985 Wis. act 29, as affected by 1987 Wis. act 27, ss. 2263 and 2264, effective September 1, 1991.]

(n) Develop a plan for children at risk under s. 118.153.

## II. *Equal Protection Under art. I, sec. 1*

We now proceed to examine the scheme of financing under the constitutional provision for equal protection. Wisconsin Constitution art. I, sec. 1 provides:

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

The same alleged deficiencies in the system of school finance are asserted as the basis for appellants' equal protection argument. More specifically, the theoretical basis of appellants' position is that the finance system fails to treat similarly situated students equally to the extent that the quality of education a student receives depends upon his or her place of residence. The appellants further assert that the right to an equal opportunity for education is a fundamental right and that, consequently, the "legislative classification" is subject to "strict scrutiny" as opposed to the lesser "rational basis" standard.

Recently, this court restated the basis for determining the standard to be applied to equal protection challenges as follows: "'[U]nless a statute may be said to affect a "fundamental right" or to create a classification based on a "suspect" criterion, the standard this court uses in reviewing the constitutionality of a statutory classification is the "rational basis" test.'" *Treiber,* 135 Wis. 2d at 70 (quoting *Hilber v. State,* 89 Wis. 2d 49, 54, 277 N.W.2d 839 (1979)). Appellants have not asserted that the alleged discrimination affects a "suspect" class. We would, furthermore, have rejected a claim of wealth discrimination constituting a suspect

criterion had such a claim been made. *See, e.g., San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, *reh'g denied* 411 U.S. 959 (1973) (school finance system which allegedly resulted in wealth discrimination did not affect "suspect" class). *Cf. Will v. State,* 84 Wis. 2d 397, 402, 267 N.W.2d 357 (1978).

However, we do agree with appellants that "equal opportunity for education" is a fundamental right: "The involvement of the legislature from the framing of the constitution to the present and the many cases which have come before this court, emphasize that the equal opportunity for education *as defined by* art. X, sec. 3, is a fundamental right." *Buse,* 74 Wis. 2d at 567 (emphasis added). We qualify this finding by emphasizing that "equal opportunity for education" does not mandate absolute equality in districts' per-pupil expenditures. In fact, such complete equalization is constitutionally prohibited to the extent that it would necessarily inhibit local control. *Id.* at 570–72.

Moreover, to the extent that art. X delineates state distribution of resources on an equal per-pupil basis, to assert that equal opportunity for education mandates an entirely different scheme of financing requiring the state to distribute resources unequally among students to respond to the particularized needs of each student is inconsistent with the intent evidenced in the express language of art. X. Accordingly, since the deficiency allegedly exists not in the denial of a right to attend a public school free of charge, nor in the less affluent districts' failure to meet the educational standards delineated under sec. 121.02, Stats., nor in the state's failure to distribute state resources to the less affluent districts on at least an equal per-pupil basis as

distribution is made to wealthier districts, no fundamental right is implicated in the challenged spending disparity.

Our decision today upholding the constitutionality of the school finance system is consistent with principles articulated by the United States Supreme Court in *Rodriguez,* 411 U.S. 1. However, our analysis differs conceptually regarding the appropriate standard to be applied to review the constitutionality of a school finance system under an equal protection challenge. Specifically, in *Rodriguez,* the Court held that there is no fundamental right to education, on the basis of its finding that such right was neither explicitly nor implicitly protected under the federal Constitution. *Id.* at 35. This holding was reaffirmed, although somewhat qualified, in *Plyler v. Doe,* 457 U.S. 202, *reh'g denied* 458 U.S. 1131 (1982), where the Court again stated that education is not a fundamental right, but stated that there could be no rational basis for the *complete denial* of education unless the discrimination "furthered some substantial goal of the State." *Id.* at 224.

Further clarification of the appropriate standard to be applied regarding a federal equal protection analysis concerning education was provided in *Papasan v. Allain,* 478 U.S. 265 (1986). In *Papasan,* the Court reiterated that in *Rodriguez* the Court did not "foreclose the possibility 'that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either [the right to speak or the right to vote].'" *Id.* at 284, quoting *Rodriguez,* 411 U.S. at 36. However, allegations asserting the denial of a minimally adequate education were rejected in *Papasan,* where the claim focused upon spending "disparities" rather than alleging that the school children "are not taught to read or write ... [or] that they receive no

instruction on even the educational basics ...." *Id.* at 286. Accordingly, in *Papasan,* the *Rodriguez* rational basis standard was applied.

Therefore, notwithstanding our recognition that education is, to a certain degree, a fundamental right, we apply, as did the United States Supreme Court in *Rodriguez,* a rational basis standard because the rights at issue in the case before the court are premised upon spending disparities and not upon a complete denial of educational opportunity within the scope of art. X.

A similar analysis was applied by the Supreme Court of Arizona in *Shofstall v. Hollins,* 110 Ariz. 88, 90, 515 P.2d 590, 592 (1973), in which the court held that the education clause in the constitution providing for "a general and uniform public school system" created a fundamental right to "basic education." However, the court nevertheless applied a rational basis standard in its examination of the spending disparities created by the school finance system. The court upheld the finance system and noted that "[a] school financing system which meets the educational mandates of our constitution, *i.e.,* uniform, free, available to all persons aged six to twenty-one, and open a minimum of six months per year, need otherwise be only rational, reasonable and neither discriminatory nor capricious." 110 Ariz. at 90, 515 P.2d at 592.

Prior to embarking upon an investigation of a rational basis, we note that ch. 121, Stats., does not facially discriminate against appellants or like districts. In fact, any facial discrimination under ch. 121 discriminates in favor of property-poor districts in pursuit of the goal of minimizing the impact of wealth disparities upon educational opportunities. To the extent that district per-pupil expenditures may differ as

a consequence of the operation of ch. 121, this difference is a result of decisions made at the local level—a variation whose legitimacy is grounded in the constitutional requirement that control be retained by localities.

As we stated in *Buse,* 74 Wis. 2d at 572:

> Considering the expressed provisions of art. X, sec. 4; the expressed concern of the framers of the constitution that local interest in local school systems be maintained; and the contemporaneous construction evidenced by sec. 40, ch. 19, Revised statutes of 1849, it is evident that the power possessed by local districts to determine what educational subjects it will offer over and above those required by the state, and to raise funds therefor, is not merely a delegated power. Rather the state-local control dichotomy in that limited regard is part and parcel of the constitution. That dichotomy has been an essential feature of our educational system since the adoption of the constitution and that fact in itself is entitled to some weight. *Board of Education v. Sinclair,* [65 Wis. 2d 179, 222 N.W.2d 143 (1974)].
>
> Local districts retain the control to provide educational opportunities over and above those required by the state and they retain the power to raise and spend revenue "... for the support of common schools *therein,* ..." (Emphasis added.) These rights of the local districts have their foundations in the constitution.

The principle of local control in Wisconsin, therefore, is not merely a theoretical notion, but rather is a constitutionally based and protected precept as to which the framers of our constitution were firmly committed.

The Court in *Rodriguez* likewise respected the need to permit localities the retention of control in education. At issue in *Rodriguez* were spending disparities among districts which existed under the challenged school finance system. The finance system was a "foundation plan" which permitted district supplements from local property taxes and, consequently, the system resulted in spending disparities. The Court described the nature of the educational finance dilemma as follows: "'The history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children.'" 411 U.S. at 49, quoting J. Coleman, Foreword to G. Strayer & R. Haig, The Financing of Education in the State of New York (1923). The Court found the balance between the two described forces to have been properly struck in the Texas school finance system:

> While assuring a basic education for every child in the State, it permits and encourages a large measure of participation in and control of each district's schools at the local level. In an era that has witnessed a consistent trend toward centralization of the functions of government, local sharing of responsibility for public education has survived. The merit of local control was recognized last Term in both the majority and dissenting opinions in *Wright v. Council of the City of Emporia,* 407 U.S. 451 (1972). Mr. Justice Stewart stated there that "[d]irect control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society." *Id.,* at 469. The Chief Justice, in his dissent, agreed that "[l]ocal control is not only

vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well." *Id.,* at 478.

*Id.*[12]

[12]Similar deference to local control was expressed in *Bd. of Ed., Levittown Union Free School Dist. v. Nyquist,* 57 N.Y.2d 27, 45, 439 N.E.2d 359, 367–68, 453 N.Y.S.2d 643, 651 (1982), in which a school finance system was upheld:

> It is the willingness of the taxpayers of many districts to pay for and to provide enriched educational services and facilities beyond what the basic per pupil expenditure figures will permit that creates differentials in services and facilities. Justification for a system which allows for such willingness was recognized by the Supreme Court of the United States in *San Antonio School Dist. v. Rodriguez,* [411 U.S. 1 (1973)]. ...

The Supreme Court of Idaho in *Thompson v. Engelking,* 96 Idaho 793, 803, 537 P.2d 635, 645 (1975), likewise viewed disparities in per-pupil expenditures resulting from an equalization scheme of financing as follows:

> The prudent and correct path is to continue with an analysis of the equal protection argument along the traditional lines of the rational basis test. Using such an analysis, we find that the Legislature, acting in its plenary capacity to establish and maintain a system of public education, has acted rationally and without constitutional discrimination in setting up a system of public education, has acted rationally and without constitutional discrimination in setting up a system of financing, wherein a large portion of revenues for the public schools are levied and raised by and for the local school districts.

Additionally, the finance system was not found to be inconsistent with a state constitutional provision for a "uniform system of public schools." The court held that the education clause did not "establish education as a fundamental right. Nor, does it dictate a central state system of equal expenditures per district." *Id.* at 806, 537 P.2d at 648. *See also McDaniel v. Thomas,* 248 Ga. 632, 648, 285 S.E.2d 156, 167 (1981); *Hornbeck v. Somerset County Bd. of Ed.,* 295 Md.

501

The Court in *Rodriguez* also emphasized that the school finance system implicated issues of fiscal policy and educational policy, both as to which the legislature should be accorded deference:

> [W]e stand on familiar ground when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. Yet, we are urged to direct the States either to alter drastically the present system or to throw out the property tax altogether in favor of some other form of taxation. No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause.
>
> In addition to matters of fiscal policy, this case also involves the most persistent and difficult questions of educational policy, another area in which this Court's lack of specialized knowledge and experience counsels against premature interference

597, 654, 458 A.2d 758, 788 (1983); *Fair School Finance Council of Oklahoma, Inc. v. State,* 746 P.2d 1135, 1146 (Okla. 1987).

Not all courts attach significance to principles of local control. *See, e.g., Dupree v. Alma School District No. 30 of Crawford County,* 279 Ark. 390, 651 S.W.2d 90 (1983); *Serrano v. Priest,* 18 Cal. 3d 728, 557 P.2d 929, 135 Cal. Rptr. 345 (1976), *cert. denied sub nom. Clowes v. Serrano,* 432 U.S. 907 (1977). Given the unequivocal concern of the framers of the Wisconsin Constitution that districts maintain local control, we are not at liberty to so lightly dispose of these principles of shared control and responsibility.

with the informed judgments made at the state and local levels. Education, perhaps even more than welfare assistance, presents a myriad of "intractable economic, social, and even philosophical problems." *Dandridge v. Williams,* 397 U.S. [471] at 487 [(1970)]. The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. *Jefferson v. Hackney,* 406 U.S. [535], at 546–547 [(1972)].

*Id.* at 41–42 (quoted in part in *Treiber,* 135 Wis. 2d at 66–67).

This court has previously expressed deference to legislative policy involving fiscal-educational decisions:

If "character of instruction" was all that was required to be "as nearly uniform as practicable" under the mandate of the constitution, then it was left up to this court to ultimately determine what subjects were to be included in "character of instruction" and *to the legislature to determine what uniformity was "practicable."*

*Buse,* 74 Wis. 2d at 566 (emphasis added). While our deference would abruptly cease should the legislature determine that it was "impracticable" to provide to each student a right to attend a public school at which a basic education could be obtained, or if funds were discriminatorily disbursed and there existed no rational basis for such finance system, we will otherwise defer to the legislature's determination of the degree to which fiscal policy can be applied to achieve uniformity. Consequently, we hold, for the reasons discussed above,

that in the present case there is a rational basis justifying any disparities in per-pupil expenditures resulting from the operation of ch. 121, Stats., the rational basis being the preservation of local control over education as mandated by art. X of the Wisconsin Constitution.[13]

Because issues such as equality in education are peppered with political perceptions and emotionally laden views, we have carefully restrained our consideration of the constitutional issues before us from becoming so flavored.[14] Therefore, our approach to the case at

---

[13]Furthermore, even if strict scrutiny were the appropriate standard to be applied, we would find the school finance system constitutional. Where strict scrutiny is applied, "a statutory classification will be upheld only if the classification promotes compelling government interests and if it is narrowly drawn to express only such interests." *Treiber,* 135 Wis. 2d at 70. The requirement that local control of schools be retained is of constitutional magnitude and necessarily compelling.

Additionally, since aid is distributed under ch. 121 under a formula which operates to equalize local tax bases by means of a minimum guaranteed valuation, the school finance scheme is "narrowly drawn" to promote local control while assuring the maximum uniformity in educational opportunity deemed practicable. In fact, but for this court's decision in *Buse,* striking down the negative aid component of ch. 121 upon finding that such a degree of equalization was not mandated by the uniformity provision of art. X and was unconstitutional under the art. VIII, sec. 1 requirement of uniform taxation, it is most unlikely that the appellants would be before the court today.

[14]It is submitted that the dissent has fallen prey to the admittedly tempting emotionally clad arguments in the present case. This result is evidenced by its confusion of arguments seeking to declare the school aid formula unconstitutional because of its inability to meet the needs of students for special programs with arguments—which are simply not the basis of this case—that certain districts are unable to provide their students with a "basic"

bar has been with a "'disciplined perception of the proper role of the courts in the resolution of our State's educational problems, and to that end, more specifically, judicial discernment of the reach of the mandates of our State Constitution in this regard.'" *Hornbeck v. Somerset County Bd. of Ed.,* 295 Md. 597, 658, 458 A.2d 758, 790 (1983) (quoting *Bd. of Ed., Levittown Union Free School Dist. v. Nyquist,* 57 N.Y.2d 27, 49 n. 9, 439 N.E.2d 359, 369 n. 9, 453 N.Y.S.2d 643, 654 n. 9 (1982)). "To do otherwise would be an unwise and unwarranted entry into the controversial area of public school financing, whereby this Court would convene as a 'super-legislature,' legislating in a turbulent field of social, economic and political policy." *McDaniel v. Thomas,* 248 Ga. 632, 644, 285 S.E.2d 156, 165 (1981) (quoting *Thompson v. Engelking,* 96 Idaho 793, 798, 537 P.2d 635, 640 (1975)).

Finally, because we find the general equalization formula under ch. 121 to be constitutional under both art. X, sec. 3 and art. I, sec. 1 of the Wisconsin Constitution, we have not needed to incorporate into our constitutional analysis the legislation which was

education. This confusion misconstrues the nature of this case, which focuses not upon the availability of basic programs but rather upon the particularized needs of economically disadvantaged students for whom a basic educational opportunity may insufficiently address their special needs. Stated otherwise, there is no contention that a student from another district without "special" educational needs would not receive an adequate basic education in any of the Milwaukee public schools. This distinction is not made to diminish the significance of the special needs of economically disadvantaged students, but merely to explain that the infirmity of the school aid system is not of constitutional magnitude. Such particularized needs can best be addressed by the legislature, which is uniquely equipped to evaluate and respond to such questions of public policy, and not by the improvident assumption of such power by this court.

enacted subsequent to the commencement of this litigation.[15] However, because our deference to the legislature was with recognition that the deficiencies addressed by appellants and, in part, conceded by respondents, are significant, we note that many of the specific concerns of the appellants have been subsequently addressed by the legislature. Specifically, we note the following statutory provisions enacted in 1985 Wis. act 29 and 1987 Wis. act 27: sec. 115.44, Stats., (establishing "early identification program" to "assist minority and economically disadvantaged pupils in grades 8 to 12 in pursuing higher educational opportunities by providing direction toward attainment of career goals"); sec. 121.004(7)(c), Stats. (providing that a pupil attending a five-year-old kindergarten requiring full-day attendance shall be counted as one pupil); sec. 115.45(4)(a), Stats., (providing grants for programs including structured educational experiences for four-year-old pupils focusing on the needs of low-income pupils); sec. 121.85(6)(g), Stats. (providing additional .2 weighting factor for children in minority census tract exceeding base year enrollment); sec. 118.153, Stats. (state aid for programs for "children at risk"); and sec. 121.10, Stats. (providing for minimum state aid to school districts based upon median household income).

More recently, additional legislation was enacted and was targeted to respond to the problems of educationally and economically disadvantaged students. This legislation, which amended ch. 119, Stats., was contained within the budget bill, 1987 Wis. act 399.

---

[15]The dissent has concluded, "In addressing the constitutionality of the school financing formula, the majority improperly considers legislation which was not in effect at the time of the circuit court findings." Dissenting opinion at 530. The dissent is simply wrong.

Those provisions of 1987 Wis. act 399 which addressed educational problems associated with poverty included the following: (1) Section 371d, creating sec. 119.71, Stats., which provided grants to Milwaukee public schools for expansion of the half-day five-year-old kindergarten program to a full-day program for children who meet federal income eligibility standards for free lunch; (2) sec. 371h, creating sec. 119.72, Stats., which provided aid to Milwaukee public schools for early childhood education for four- and five-year-olds, targeting educationally disadvantaged pupils; (3) sec. 371mp, creating sec. 119.74, Stats., which provided for the establishment of mentor programs for economically or educationally disadvantaged pupils. The sum appropriated to finance the kindergarten and early childhood education programs for Milwaukee public schools provided under secs. 371d and 371h, respectively, is 3.1 million dollars. 1987 Wis. act 399, sec. 20.255(2)(ec). Thus, the legislature has been responsive to the problems before the court.

Additionally, while societal action in the form of support of local schools cannot be compelled, it may be applauded. It would appear that applause is warranted, due to a renewed interest in improving education with community involvement. Examples of community effort to work in conjunction with the public school system may be found in programs such as the "One on One" program for at-risk youth initiated by the Greater Milwaukee Committee, providing mentors to assist students with school. This program is premised upon the following principles:

> The business community must recognize that it has both a role and a responsibility in the education of our young people. These boys and girls are an

important part of the future workforce in Milwaukee. The widely-reported conditions which adversely affect many city children—minority unemployment and poor housing conditions, truancy, delinquency, high drop out rate, near-rampant teen pregnancy, excessive television viewing, disinterest in learning—and the resulting widespread lack of skills basic for both employment and citizenship—must be the concern of business as well as schools, city and county service providers, families, churches and community groups. It is in the self-interest of companies both large and small to assist in addressing these problems and to help our public schools prepare our children for the world of work. Some will suggest that, in so doing, the business community is meddling in someone else's area of responsibility. We reject this parochial notion. If we are to succeed in improving the quality of education, all sectors, including business, must participate. While we concede that we are not experts in education delivery, we should be involved in education design and outcomes. We want those primarily responsible for the learning process to have a better chance for success with all students. We want to work collaboratively with Board members, administrators and teachers to create a climate conducive to widespread levels of greater achievement.

Greater Milwaukee Committee, Education Committee, First Annual Report, April 6, 1987. *See also* Greater Milwaukee Committee, Greater Milwaukee's One on One, An Initiative for At-Risk Youth, September 14, 1987. A recent study discussed the benefits of community involvement:

One way to encourage systemic reforms is to involve the entire community in efforts to solve the dropout problem. It is evident from the various

surveys and program inventories discussed here, that few school districts use the resources of social service agencies, community and business groups, parents, or religious and civic organizations as integral components of their dropout programs. It is also clear that the dropout problem is extremely complex and that schools should not be expected to solve it in isolation. Several recent initiatives speak to this understanding.

\* \* \*

Perhaps the strongest argument for community-wide intervention to reduce the school dropout rate rests in that sense of ownership. If it is recognized as a collective problem, and that working together on it can generate societal benefits which are greater than the personal costs of participation, then the community is more likely to cooperate, to coordinate its resources, and to make the extraordinary effort that is required to save many of our floundering youth.

Clark, *Preventing School Dropouts: What Can Be Done?*, 7 Citizens Budget Commission No. 4, at 6–7. *See* Gill, *No Easy Answers To Dropout Problem,* Milwaukee Sentinel, Apr. 7, 1988, Part 1 at 16. *See also* newly created sec. 119.74, Stats. (providing for grants for establishment of mentor programs). Certainly such community efforts are consistent with the framers' purpose of assuring that an "adequate interest was felt by the people, in common schools ...." Journal and Debates, *supra* p. 488, at 335.

What has been challenged in the case at bar is not that less affluent schools have insufficient funds to provide for basic education, but that they have inade-

quate funds to provide specialized programs and to meet the particularized needs of students related to the effects of poverty. We recognize that more and improved programs are needed in the less affluent or overburdened districts but find that these legitimate demands may not be correctly described as claims for uniformity under Wis. Const. art. X, sec. 3 or equal treatment under Wis. Const. art. I, sec. 1, but rather constitute demands for that amount of resources necessary to meet the additional costs imposed by the student constituency of these districts. Such demands cannot be remedied by claims of constitutional discrepancies, but rather must be made to the legislature and, perhaps, also to the community.

*By the Court.*—The judgment of the circuit court is affirmed.

STEINMETZ, J. (concurring). The legislative formula which is challenged in this case is the formula which provides the basis for distribution of public funds for the financing of public elementary and secondary education. Under the state's general aid formula, the largest portion of state aid is distributed under the label of equalization aid.

I agree with the result reached by the majority; however, in coming to this conclusion, I find the appellants have not met their burden of proving the school finance system unconstitutional. The majority devotes attention to the protection of local control. I do not find local control arguments relevant to whether the formula contravenes either the uniformity provision or the guarantee of equal protection.

The majority's description of the school finance formula on pages 476–481 of the majority demonstrates its complexity. Although the issue is not its complexity,

it would have been helpful for one of the parties to set forth the formula in a clear fashion, if possible.

The issue in this case is whether the formula has been proven unconstitutional, either on its face or in application. The appellants argue that the school financing system violates art. I, sec. 1[1] of the Wisconsin Constitution which guarantees equal protection of the laws and art. X, sec. 3[2] which requires that the legislature provide school districts that are as nearly uniform as practicable. Therefore, the state constitution guarantees an equal opportunity of an education that is as nearly uniform as practicable as that in another area of the state. The legislature is only required to present an equal opportunity for an education to the students. If the students are not able to take advantage of the opportunities, there is no way a change in the formula can force those opportunities upon them.

I believe the standard of proof in this type of action should be clearly set forth by this court. The United

[1]Article I, sec. 1 of the Wisconsin Constitution provides as follows:

> **Equality; inherent rights.** Section 1. All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

[2]Article X, sec. 3 of the Wisconsin Constitution provides as follows:

> **District schools; tuition; sectarian instruction; released time.** Section 3. The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable; and such schools shall be free and without charge for tuition to all children between the ages of 4 and 20 years; and no sectarian instruction shall be allowed therein; but the legislature by law may, for the purpose of religious instruction outside the district schools, authorize the release of students during regular school hours.

States Supreme Court in *San Antonio School District v. Rodriguez,* 411 U.S. 1, 41-42 (1973) stated:

> [W]e stand on familiar ground when we continue to acknowledge that the Justices of this Court lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues. Yet, we are urged to direct the States either to alter drastically the present system or to throw out the property tax altogether in favor of some other form of taxation. ...

> Education, perhaps even more than welfare assistance, presents a myriad of "intractable economic, social, and even philosophical problems." *Dandridge v. Williams,* 397 U.S. [471] at 487 [1970)]. The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that, within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. *Jefferson v. Jackney,* 406 U.S. [535] at 546-47 [(1972)].

This court stated in *Buse v. Smith,* 74 Wis. 2d 550, 566, 247 N.W.2d 141 (1976), as to deference to legislative policy involving fiscal-educational decisions:

> If "character of instruction" was all that was required to be "as nearly uniform as practicable" under the mandate of the constitution, then it was left up to this court to ultimately determine what subjects were to be included in "character of instruction" and to the legislature to determine what uniformity was "practicable."

Without a showing beyond a reasonable doubt that the legislature has unconstitutionally denied a uniform

opportunity for education or has treated students unequally, I agree with the majority that, "we [the court] will otherwise defer to the legislature's determination of the degree to which fiscal policy can be applied to achieve uniformity." Majority at 503. The school funding system is declared in a statute. A statute is presumed constitutional and a party challenging its constitutionality must prove it unconstitutional beyond a reasonable doubt. *Soo Line R. Co. v. Transportation Dept.*, 101 Wis. 2d 64, 76, 303 N.W.2d 626 (1981).

I believe, as does the majority, that education is a fundamental right in Wisconsin and "that where a statutory classification adversely affects or interferes with a fundamental constitutional right, the classification is subject to strict scrutiny and the normal presumption of constitutionality will not apply." *Buse,* 74 Wis. 2d at 580 (*quoting Town of Vanden Broek v. Reitz,* 53 Wis. 2d 87, 93, 191 N.W.2d 913 (1971)). However, in this case the appellants do not challenge any statutory classification. They merely challenge the statutory method by which public schools are funded— the statutory method of implementing the constitutional mandate. Similarly, the challenge as to the degree of uniformity resulting from the statutory scheme only questions legislation. *Buse,* 74 Wis. 2d at 568. Thus, the appellants carry the burden of proving that the statutory scheme is unconstitutional beyond a reasonable doubt. *Treiber v. Knoll,* 135 Wis. 2d 58, 64, 398 N.W.2d 756 (1987).

Whether a degree of uniformity is practicable is a policy decision and in the province of the legislature. This court stated in *Buse,* 74 Wis. 2d at 568:

513

> Whether absolute uniformity of an equal opportunity for education in all school districts of the state is socially desirable, is not for this court to decide. We can only conclude that the plain meaning of sec. 3, art. X does not mandate it.

With that previous statement by the court, it is difficult to show that the lack of uniformity rises to the level of unconstitutionality. If a party could prove that the Milwaukee Public School System deteriorated to a point so as to not be comparable to other districts, the legislature would be required to take action under art. X, sec. 3. As long as the level of education funded is reasonably acceptable, the funding system is not unconstitutional. I do not believe the appellants met their burden.

The circuit court decision recapitulated the evidence offered by the appellants which indicated that certain areas of the state would benefit from additional and specialized programs. The appellants have shown by test results that additional funds are needed because currently the funds do not cover the expenses incurred by disciplinary problems and early educational needs, *i.e.,* headstart programs, early kindergarten. Additional funds may not be the exclusive answer but they may help in providing wanting children with supplies so they do not start the school day without the tools to learn and providing funds for expenses incurred because of disciplinary problems so that teachers can devote their time and energies to their expertise of teaching students. These are concerns of both a state and local nature.

No one refutes that additional public support would be beneficial. Yet the constitution simply does not mandate such expenditures. The state constitution requires that an education system which is as nearly

uniform as practicable be presented to each student. It does not require the legislature to allocate funds to provide a school system which produces students who are educated to a level as nearly uniform as practicable, although the latter may be desirable.[3] This case has been a public cry to the legislature, disguised as a constitutional attack, that additional funds are necessary to improve education in some districts.[4]

The challenge that the formula fails to treat similarly situated students equally to the extent that the quality of education a student receives depends upon his or her place of residence also has not been demonstrated as causing a constitutional equal protection violation of art. 1, sec. 1 of the Wisconsin Constitution.

Although I rely on different grounds, I concur with the majority's result.

WILLIAM A. BABLITCH, J. (dissenting). The majority characterizes this case as one of "spending disparities." That is not at all the focus of this case. The primary issue is whether the state, through its system of school financing, has met its constitutional obligation to provide an equal opportunity for educa-

[3]It is interesting to note at this point that the school district with the least expenditure per pupil, the Denmark School District, was not claiming a need for additional funds in this suit. This indicates that the amount given to a district does not totally control a district's need. The amount must be compared to the need of a district when attempting to produce a uniform product.

[4]Recently the legislature proposed a constitutional amendment. If adopted, Art. VIII, sec. 1(a), will read: "Except as authorized by law for capital expenditures, the proceeds of the tax on property shall not be used to operate the common schools." 1987 Enrolled Joint Resolution 75.

tion to all children of this state, rich and poor alike. As the record amply demonstrates, it has not.

Every member of this court agrees on four basic points:

1) that it is a fundamental right of every child in this state to have an equal opportunity for education;

2) that the state is constitutionally mandated to provide that opportunity;

3) that the method the state has chosen to fulfill its constitutional responsibility is the statutorily created system of financing K–12 public education;

4) that the trial record clearly establishes that the educational needs of a significant number of school children in this state, primarily those from high poverty districts, are very great, and these needs are not being met. These children come to school unready to learn. Compensatory education programs are unavailable to remedy their learning deficiencies. Supportive services and exceptional educational needs are insufficient to assist them. The little money that is channeled into these programs comes at the expense of the regular educational programs, thereby "shorting" the regular programs. The result, as one educator at trial stated, is that "until you meet those (social and emotional) needs, you're not going to be doing much educating. ..." Circuit Court dec. at 18.

The reason these educational needs are not being met was established beyond any doubt in the trial court: the state system of financing K–12 public education is fundamentally flawed.

The fundamental flaw of the state formula is that it distributes dollars without regard to educational needs. It assumes that every child in this state begins his or her educational journey from the same starting point. If all children began that journey from the same

starting point, then the formula would provide no constitutional objection: every child would start with the same opportunity. That may well have been the reality, with few exceptions, in 1848. It is not even close to reality today. The result is that a significant number of school children in this state are denied an equal opportunity to become educated people.

To use an analogy which everyone can understand, while a majority of our children are handed the "educational ball" on the twenty yard line, a significant number are handed this ball on the one yard line with a three-hundred pound lineman on their back. Unquestionably both groups of youngsters have the "opportunity" to score an educational touchdown. The opportunity, however, is far from equal.

I conclude that the uniformity clause of art. X, sec. 3, of the Wisconsin Constitution mandates that the state provide a character of instruction in the state schools such that each child is provided with a uniform opportunity to become an educated person. Neither absolute uniformity nor absolute equality is required. The funding may come in part from the state and part from local government, or in whole from the state. However it comes, the opportunity to become an educated person must be relatively equal across the state. To use the analogy once more, the uniformity clause does not mandate that the character of instruction be such that everyone must score a touchdown; it does mandate that everyone on the playing field have an equal opportunity to do so. Because the state has the constitutional responsibility to provide this equal opportunity, and because it has failed to do so, I respectfully dissent.

## I.

The majority opinion recognizes, as did a unanimous court in *Buse v. Smith,* 74 Wis. 2d 550, 567, 247 N.W.2d 141 (1976), that equal educational opportunity is a fundamental right, grounded in art. X, sec. 3 of the Wisconsin Constitution. That this is so is readily gleaned from a review of the constitutional convention proceedings of 1846 and 1848.

What emerges from those proceedings is a recognition of the value of education, and a commitment to provide everyone, rich and poor alike, an equal opportunity to become an educated person. The framers were resolved that this opportunity be free to all, and that it be the state's responsibility to implement this right and provide the primary financial support. In addition, the framers determined that the local population of the respective school districts provide some measure of financial support in order to maintain local interest.[1]

The first four sections of art. X which emerged in 1848 were intended to remedy the patchwork system of district schools common during the territorial years. Article X contained all of the elements necessary for a system of education provided for and overseen at the state level. The first section, cited in full below,[2]

---

[1]*See Journal And Debates Constitutional Convention* (1847–48) 335; Comment, *State Constitutional Restrictions On School Finance Reform: Buse v. Smith,* 90 Harv. L. Rev. 1528, 1538; *Buse v. School Finance Reform: A Case Study of the Doctrinal, Social and Ideological Determinants of Judicial Decisionmaking,* 1978 Wis. L. Rev. 1071, 1121–23, 1148–50. For an informative discussion and analysis of Wisconsin Constitution, Art. X, *see* Comment, *The Egalitarian Roots of the Education Article of the Wisconsin Constitution: Old History, New Interpretation, Buse v. Smith Criticized,* 1981 Wis. L. Rev. 1325.

[2]Wisconsin Constitution, art. X, sec. 1 provides:

established the office of state superintendent and provided for statewide supervision to guarantee the goal of a statewide system. The second section[3] secured the school lands as the basis of state support for the district schools, a source of funds that most felt would fund the entire system munificently. The third section[4] made it clear that the state had the constitutional responsibility to implement the system. The fourth section[5] described the responsibilities of the two small political units involved in statewide education, the towns and cities.

Section 3, the focus of this case, engendered no debate at either constitutional convention. This court has traditionally interpreted sec. 3 by looking to the constitutional debates surrounding the education article and by considering the conditions and practices which existed in 1848.

---

The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties and compensation shall be prescribed by law.

[3]Wisconsin Constitution, art. X, sec. 2 provides:

The proceeds of all lands that have been or hereafter may be granted by the United States to this state for educational purposes ... shall be set apart as a separate fund to be called "the school fund," the interest of which ... shall be exclusively applied to the following objects, to wit:

(1) To the support and maintenance of common schools. ...

[4]Wisconsin Constitution, art. X, sec. 3 provides:

The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable. ...

[5]Wisconsin Constitution, art. X., sec. 4 provides:

Each town and city shall be required to raise [a tax] ... for the support of common schools. ...

Article X, sec. 3 of the Wisconsin Constitution reads in part, as follows: "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable. ..."

Although the *Buse* court unanimously recognized that equal opportunity for education is a fundamental right defined in art. X, sec. 3, we have never had the occasion to define precisely that term. This court has determined that the uniformity requirement refers to the "character of instruction" provided in the district schools. *State ex rel. Zilisch v. Auer,* 197 Wis. 284, 289–90, 221 N.W. 860 (1928).

Character of instruction has been more recently expressed as "services, procedures, opportunities or rules" provided in district schools. *Zweifel v. Joint Dist. No. 1, Belleville,* 76 Wis. 2d 648, 653, 251 N.W. 2d 822 (1977).

Although this court has never precisely defined the term "equal opportunity for education," we have stated that the uniformity clause refers to "the character of instruction" that should be provided in district schools, and we have referred to the character of instruction that should be provided as denoting "'the training that these schools should give to the future citizens of Wisconsin.'" *Buse,* 74 Wis. 2d at 566 (quoting *Zilisch,* 197 Wis. at 289–90).

The constitutional requirement that the schools provide training for the future citizens of Wisconsin is common to other state constitutions. It has generally been defined as embracing broad educational opportunities needed to equip children for their roles as citizens, participants in the political system, and competitors in both the labor market and the marketplace of ideas. *See Robinson v. Cahill,* 62 N.J. 473, 303 A. 2d 273, *cert. denied,* 414 U.S. 976, 295 (1973); *Seattle*

*Sch. Dist. No. 1 of King Cty. v. State,* 90 Wash. 2d 476, 585 P.2d 71, 94 (1978).

Our constitutional history is rich with references to the importance of education and the need for it to be provided free to rich and poor alike. Consistent concern was expressed that our educational system be "suited to the entire wants of our varied population, and our extended Territory." *Croswell Report, Committee On Common Schools* 3, H.R., January 26, 1846. From this history, as well as our past cases interpreting the Education Article, I conclude that the mandate given by the uniformity clause in art. X, sec. 3 of the Wisconsin Constitution is that the state provide a character of instruction in the state schools such that all children are provided with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually. In short, the state must provide a character of instruction that allows each child an equal opportunity to become an educated person. This was the unequivocal intention of the framers of our constitution as demonstrated time and time again in the history of our constitutional debates.

## II.

A careful review of the circuit court's findings of fact are essential to an understanding of the problem. The circuit court held a 16 day trial in 1985. Professional educators, school administrators, academic experts on the relationship between poverty and educational needs and experts on educational finance systems testified for the plaintiffs. Their testimony was for the most part undisputed. The circuit court's findings of

fact are a searing indictment of the challenged system of financing K–12 public education in this state.

> Plaintiffs' evidence does show that the wide expenditure and tax effort disparities in Wisconsin school districts lead to a substantial lack of equality and uniformity in the program of instruction available to all the school children in low spending school districts, and as we have observed act as a drain on the regular program of instruction in districts with very high poverty concentrations, owing to the necessity of responding to various educational overburdens.

Circuit Court dec. at 22.

As indicated by the circuit court's findings, the challenged school financing system falls far short of fulfilling this mandate:

1) Early childhood education. The circuit court found that districts with a high concentration of poverty students face special burdens in the area of early childhood education. Testimony was overwhelming as to the effectiveness of such programs for children with impaired readiness to learn. Yet great disparities exist across the state. Eighty-seven percent of the eligible four-year-olds in the Milwaukee School District are not served by *any* early childhood programs. The circuit court concluded that the evidence showed early childhood education programs overcome the problems of early deprivation to a large degree. Circuit Court dec. at 5–7.

2) Compensatory education. The circuit court also found that high poverty districts face an "extraordinary burden" in the area of compensatory education. The court noted that the need for compensatory education is the cumulative result of poverty. Poverty chil-

dren get off to a poor start at the beginning of their education and miss important elements of schooling. The circuit court concluded that "[c]ompensatory education is a valuable and *necessary* strategy for remedying skill and attitude discontinuities which many children from poverty backgrounds bring to school. ... Compensatory services funded from the school districts' budgets ... are not available in the school districts with the greatest need for them." Circuit Court dec. at 9–10.

3) Supportive services. The circuit court found that the incidence of poverty in a school district greatly increases the need for supportive services—social workers, psychologists and nurses. Problems directly related in many instances to poverty—child abuse and neglect, feelings of inadequacy, fear of authority, broken homes and alcohol abuse—require poverty districts to provide an inordinate degree of supportive services. The circuit court found that the districts' providing of supportive services does not match their burdens. Circuit Court dec. at 20.

4) Exceptional educational needs. The circuit court found that there is a relationship between the incidence of poverty and the need to provide exceptional educational services such as English language instruction and special programs for the handicapped. Circuit Court dec. at 20–21.

5) Dropout prevention programs. The circuit court found that "[i]t is a fact that the correlation between the incidence of poverty children and a need for dropout prevention programs for high-risk youth is found throughout Wisconsin." The circuit court concluded that because drop out prevention programs are costly, districts which have a great need to provide these programs are not able to do so while districts

which face a lesser educational task are able to provide such services to all their children. Circuit Court dec. at 13.

6) Voc-Tech programs. The circuit court found that the need for vocational education programs is high in districts where there are concentrations of poverty students. As with the other educational overburdens poverty entails, the court found that the disparities in the availability of voc-tech programs between high poverty districts and other districts was great. Circuit Court dec. at 13–14.

With respect to all of the above findings, the circuit court made a further finding regarding the impact these special needs have on regular programs in high poverty districts: "The result ... is that local revenues absorb much of the cost of these programs and this takes money away from regular programs. ..." Circuit Court dec. at 22.

### III.

The vehicle devised by the legislature to fulfill its constitutional mandate is a statutorily created system of financing K–12 public education. The formula, which is detailed at great length in the majority opinion, consists of two basic components: 1) a local funding component which is the principal source of school funding and is wholly dependent on local tax initiatives; and 2) a state funding component which provides for the equalization of district property tax bases up to a specified level. It is a method designed not to meet the educational needs but to distribute dollars, and that is its fatal flaw. It does not address the needs of impoverished districts which are unable to raise sufficient revenues for school funding and must divert resources

from regular programs of instruction to respond to various education overburdens. The result, as the circuit court noted, is substantial disparity in basic educational opportunity for children across Wisconsin.

The majority suggests that basic educational needs are being satisfied through this financing scheme. Majority opinion at pages 491–494. However, a close inspection of the record reveals that while some special needs of "exceptional" students are being met in overburdened school districts, such special needs programs are draining resources and staff from regular programs of instruction. For example, one school superintendent testified that because of the demand for special needs programs, his district was generally understaffed elsewhere and unable to provide the required instruction in art and music.

The majority asserts that "the rights at issue in the case before the court are premised upon spending disparities and not upon a complete denial of educational opportunity within the scope of art. X." Majority at 498. The majority offers no sense of where it would consider "spending disparities" to stop, and "denial of equal opportunity" to begin. If this record does not offer a denial of equal opportunity of education, what record will? In today's world, is the mere offering of a school house door with nothing more behind it than a basic education program sufficient to allow the state to wipe its hands of all other constitutional responsibility?

For a state which prides itself on its commitment to education, this cannot and should not be enough. For a state which historically has placed a high value on free public education to rich and poor alike, this record is a disgrace.

I would hold that the uniformity clause of art. X, sec. 3 of the Wisconsin Constitution mandates that the

state provide a character of instruction in the state schools such that each child is provided with a uniform opportunity to become an educated person. I would further hold that the school finance formula, which is the state's only effort that is before us to fulfill its constitutional mandate, fails to do so.

Does this mean there must be absolute uniformity, absolute equality? Clearly not. The constitution does not require absolute uniformity of educational opportunity nor an equal expenditure per district. In *Buse,* this court correctly held that the state could not prohibit local school districts from providing educational opportunities over and above those required by the state: "Local districts retain the control to provide educational opportunities *over and above* those required by the state and they retain the power to raise and spend revenue '... for the support of common schools *therein.* ...'" *Buse,* 74 Wis. 2d at 572. (Emphasis added.) The focus in *Buse* was on the upper end of the spectrum, the relatively property rich districts. I agree with the plaintiffs that *Buse* does not compel the conclusion that wide disparities in educational opportunities cannot be reduced by raising the quality of educational opportunities for children at the lower end of the spectrum. To achieve reasonable equality in educational opportunity for those districts having disproportionately high concentrations of children with special needs (primarily the high poverty districts), there must be adequate funding allowing a district to provide not only basic courses of instruction but special needs programs to properly prepare these children for receiving such instruction, as well as other programs designed to give these children an equal opportunity to become educated citizens. The challenged school financing scheme is not designed to meet these objectives. As one school

district superintendent testified, "[the financing formula is] not a system which is in any way directly cognizant of educational needs and tasks. It's a system designed to create taxpayer equity, ... [the formula] doesn't guarantee anything to school children. It's not a mechanism designed to insure adequate levels of resources that are commensurate with the task districts face."

Further compounding its error, the majority holds that the "preservation of local control over education" provides a rational basis justifying any disparities in per pupil expenditures and, thus, equal educational opportunity. As the majority states, "(t)o the extent that district per pupil expenditures may differ as a consequence of the operation of ch. 121, Stats., this difference is a result of decisions made at the local level—a variation whose legitimacy is grounded in the constitutional requirement that control be retained by localities." Majority at 498–499. The majority is simply wrong.

While the concept of local control over education is constitutionally-based, it has been recognized by this court in a very limited context. The dichotomy between state-local control over education in part derives from art. X, sec. 4 of the Wisconsin Constitution. This provision requires that each town and city raise tax revenues "for the support of common schools therein." Thus, while the remainder of Article X establishes the state's extensive power over education, consisting of the control over the establishment and operation of school districts, there remains some measure of local control. *Buse,* 74 Wis. 2d at 571.

However, this measure of local control has been correctly circumscribed by this court. The framers of our constitution never intended that art. X, sec. 4

compromise the educational powers and responsibilities of the state. The framers were concerned that unless the local citizens were compelled to provide some measure of financial support for their schools, they would lose interest in them. See Comment, *supra* note 1, at 1329. In *Buse* we stated that local control consists of two aspects: the power to raise funds for education, and the power to spend those funds for educational purposes *"over and above* those required by the state. ..." *Buse,* 74 Wis. 2d at 572. (Emphasis added.)

Thus, the majority is simply wrong when it states that the "legitimacy [of the variation of per pupil expenditures] is grounded in the constitutional requirement that control be retained by localities." Majority at 499. There is no such constitutional requirement. The only requirement discernible in sec. 4, and the only requirement supported by constitutional history, is the requirement that local government fund in part the cost of education. (Inasmuch as the local share in sec. 4 is tied to the amount received from the school fund, which today is of miniscule proportions, the amount constitutionally required from the local citizens is small indeed.)

There can be no question that sec. 4 does not prohibit local school districts from providing greater than equal educational opportunities for their school children through the expenditure of local revenue. Section 4 does not empower the localities to determine whether the basic educational opportunities afforded by their schools pass constitutional muster. It is this court's constitutional responsibility to decide this question, and it is the legislature's constitutional responsibility to prescribe remedies for deficiencies. Nor does sec. 4 require an impoverished school district

to live with an underfunded and therefore inadequate school system simply because they do not have the funds to provide an equal opportunity for education in their schools. If equal educational opportunity is not provided at the local school district level, the state must see that it is provided.

The concept of local control over education is at best illusory and at worst a cruel hoax for those low tax base communities which lack the local revenues necessary to provide even basic educational opportunities in their schools. Just as the rich and the poor are equally free to sleep overnight on a park bench in the dead of winter, so too the rich and the poor school districts under the guise of local control are free to decide how much concern they really have toward education. Unfortunately for the district with municipal overburden and/or a small tax base, concern for educational opportunities must end when its tax rolls can absorb no more.

## IV.

The conclusion I would reach here in invalidating the Wisconsin school finance formula is not without precedent. A review of the cases to come out of other state courts shows that a number of them, by resting their decisions on provisions of their own state constitutions, have invalidated public school financing formulae. The constitutional touchstone has sometimes been the state equivalent of the equal protection clause. *Serrano v. Priest,* 5 Cal. 3d 584, 96 Cal. Rptr. 601, 487 P.2d 1241, *cert. denied,* 432 U.S. 907 (1971); *Washakie Co. Sch. Dist. No. One v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied,* 449 U.S. 824 (1980). In other cases, the state's responsibility for providing uniform basic

educational opportunities has come from special state constitutional provisions relating to education. *Horton v. Meskill,* 172 Conn. 615, 376 A.2d 359 (1977) (finding education to be a fundamental right under Conn. Const. Art. I, Sec. 1 (1818), 20 (1965); *Id.* Art. VIII, Sec. 1 (1965); *Robinson v. Cahill,* 62 N.J. 473 (invoking N.J. Const. Art. IV, para. 1 (1875), granting the right to a "thorough and efficient" system of public schooling); *Seattle Sch. Dist,* 90 Wash. 2d 476; *Dupree v. Alma School Dist. No. 30,* 651 S.W.2d 90, 93 (Ark. 1983). (citing the principle that local control in actuality can be strengthened when equal protection violations are remedied).

## V.

In addressing the constitutionality of the school financing formula, the majority improperly considers legislation which was not in effect at the time of the circuit court's findings. Not one member of this court has the faintest notion the effect this legislation will have, fiscally or educationally. Does it, to any meaningful degree, alleviate the noted disparities in educational opportunity?

While I do not dismiss the legislature's recent effort to address the deficiencies in the school financing formula, this court is simply unable to conclude, absent specific findings of fact, what effect, if any, this legislation has on the problems noted.

## VI.

Absent this newly enacted legislation, I would hold unconstitutional the school financing formula, and direct the legislature to address anew its constitutional mandate to provide a system of education throughout

the state that gives an equal opportunity to every child in this state to become an educated person. It is the role of this court to subject law to constitutional analysis. It is not the role of this court to promulgate specific remedies. The fashioning of a constitutional system of public education is not only the legislature's constitutional prerogative, it is far better equipped than any court to do it. I am not unaware of the terrible political complexities involved in fashioning such legislation, but I have full confidence in the legislature's ability to resolve it. My conclusion does not compel a result which precludes the use of local property taxes to support education. Any number of financing formulae can be hypothesized that provide for both a state and local funding component. Whether or not the legislature chooses to do so is up to the legislature.

However, inasmuch as the legislature has enacted certain legislation referred to at pages 505–508 in the majority opinion, I would remand this case to the trial court for a hearing to determine whether the new legislation, for which there has not been a fact finding by the trial court, has corrected the constitutional deficiencies of the present formula. The findings of the trial court would then be returned to this court for review, and, if necessary, for further orders from this court. During the pendency of this procedure, the legislature would be allowed to continue to fund K–12 public education as the statutes presently provide or as the legislature should amend them.

I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN and JUSTICE SHIRLEY S. ABRAHAMSON join in this dissent.