N. PATRICK CROOKS, J.
¶ 86. {dissenting). The question of whether Act 23 violates the Wisconsin Constitution is at the intersection of profound democratic principles: the right of qualified Wisconsin citizens to vote, as explicitly guaranteed by the Wisconsin Constitution,[1] and the undisputed principle that the state has a legitimate interest in safeguarding the integrity of elections through regulations.[2] Voter identification provisions are one way the state may choose *510 to protect the legitimacy of elections. Such provisions may be constitutionally imposed even if they severely burden a person's right to vote as long as they are narrowly tailored to advance a compelling state interest. However, Act 23's photo identification requirements severely burden eligible voters without being narrowly tailored to achieve the state's compelling interests of reducing voter fraud and increasing voter confidence in the outcomes of elections.[3] For that reason, Act 23 is an unconstitutional election regulation, and I therefore respectfully dissent.
¶ 87. The United States Supreme Court's decision in Crawford v. Marion County Election Board [4] which upheld Indiana's voter identification statute, does not persuade me that Act 23 is constitutional. This is because there are substantial differences between this case and the Crawford case. First, the record in the Crawford case was not nearly as developed as the record in this case. This factor certainly influenced the Supreme Court's decision.[5] Second, Indiana's voter identification statute is not as stringent as Act 23. Most *511 importantly, the Indiana law provides for an affidavit exception that allows certain individuals to vote without photo identification.[6] In upholding Indiana's voter identification law, Justice Stevens' lead opinion commented that the severity of the burden imposed by the photo identification requirement "is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."[7] Finally, while Act 23 applies to both in-person and absentee voting, Indiana's photo identification requirements do not apply to absentee voting. Therefore, the Crawford case is neither controlling nor persuasive.
¶ 88. The majority opinion claims to approach the plaintiffs' constitutional challenge to Act 23 as a purely facial challenge.[8] In doing so it purports to evaluate Act 23 using the framework outlined by the United States Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992). However, it ultimately turns to a different legal theory to conclude that Act 23 imposes an unconstitutional de facto poll tax[9] on voters, which imposes a severe bur *512 den.[10] The de facto poll tax to which it refers is not the cost of the identification card itself, which is available free of charge, but the cost of obtaining a birth certificate, which a voter is required to have to obtain an identification card for voting.[11] After concluding that the costs of obtaining a birth certificate impose an unconstitutional de facto poll tax that severely burdens eligible Wisconsin voters, the majority then crafts a remedy which allows individuals to obtain certified copies of their birth certificates free of charge.[12] The majority concludes that its remedy lessens the burden imposed by. Act 23 on eligible Wisconsin voters to such a degree that Act 23 easily passes constitutional muster.[13]
¶ 89. I cannot agree with the majority opinion's characterization and analysis of the plaintiffs' challenge. The majority incorrectly characterizes the challenge as a purely facial challenge. It fails to apply the Anderson/Burdick framework correctly. It improperly relies on poll tax case law. Even if I were to assume that poll tax analysis applied, the majority's attempt to alleviate the de facto poll tax for eligible Wisconsin voters results in an unworkable solution that fails to cure the unconstitutionality of Act 23. Specifically, the majority opinion's remedy appears to leave in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is *513 required for supporting documents. If the majority opinion leaves in place the discretion of DMV administrators to issue exceptions to those burdened by the cost of obtaining underlying documentation,[14] then it fails to guarantee constitutional protections against poll taxes. On the other hand, if the majority opinion requires DMV administrators to issue photo identification cards to individuals who are burdened by the cost of obtaining required underlying documentation,[15] it is directing a non-party to take specific action, which it has no authority to do. In sum, the remedy imposed by the majority, under either approach, is flawed. It impinges on the legislature's role by interpreting administrative code provisions that are not part of this challenge and by directing an administrative agency that is not a party to this case. I urge the legislature to take action to cure the unconstitutionality of Act 23. Without such action, the remedy crafted by the majority leaves Act 23 unconstitutional.
¶ 90. The appropriate framework to analyze the plaintiffs' challenge to Act 23 is the modified facial challenge approach, which the United States Supreme Court has applied[16] in comparable cases. Under a modified facial challenge, a "law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in rela *514 tion to the statute's plainly legitimate sweep.' "[17] This differs from a purely facial challenge, which necessarily fails if any application of the challenged law is constitutional.
¶ 91. A modified facial challenge is appropriate in this type of case because neither a purely facial challenge nor an as-applied challenge is practical in these circumstances. A purely facial challenge requires that a party prove that a law is unconstitutional under all circumstances.[18] Based on the burden that it imposes, a purely facial challenge to Act 23 fails without question because the photo identification requirements of the law could be constitutionally applied to any Wisconsin voter who already possesses the appropriate identification. In contrast to a purely facial challenge, an as-applied challenge looks at whether a law violated the constitutional rights of a particular person under the facts presented.[19] Here, the record developed before the circuit court established that a substantial number of eligible Wisconsin voters lack Act 23-compliant identification and are severely burdened by its requirements. A requirement that each burdened individual bring an as-applied challenge would perpetuate uncertainty about the constitutionality of Act 23, as well as result in an extreme volume of litigation that would take a significant amount of time and resources to conclude. Since the purely facial and as-applied frameworks cannot appropriately address the constitutionality of Act 23,1 would apply a modified facial approach as utilized by the United States Supreme Court in analogous situations discussed in more detail herein.
*515 ¶ 92. Under a proper application of the Anderson/ Burdick framework, a modified facial challenge to Act 23's constitutionality succeeds in establishing a violation of the Wisconsin Constitution. The only proper remedy is invalidation of the law. This is because Act 23 imposes severe burdens on a substantial number of eligible Wisconsin voters who do not currently possess an Act 23-compliant form of identification, and that burden cannot be remedied by this court. First, and most importantly, even though the identification card itself can be obtained at no cost, there are costs associated with acquiring the underlying documents required to obtain an identification card. Those costs impose a severe burden on certain eligible Wisconsin voters, both those born in Wisconsin and those born in other states and other countries. Second, for certain voters the time and effort required to obtain Act 23-compliant identification adds to the severity of the burden.
¶ 93. The majority recognizes that a severe cost burden exists, but instead of considering such burden in a straightforward manner under the well-established Anderson/Burdick framework, it applies poll tax analysis and crafts a remedy that purports to alleviate the burden imposed by Act 23. The majority concludes that the costs associated with obtaining a free voter identification card are the functional equivalent of an unconstitutional poll tax. No party or amicus brief advanced this argument. Instead all recognized the Anderson/ Burdick test as the applicable framework. That test requires that a heightened level of scrutiny apply to any voting regulation that imposes a severe burden.[20] I conclude that Act 23 imposes such a burden on a substantial number of eligible Wisconsin voters. This *516 means Act 23 must be narrowly tailored to achieve compelling governmental interests if it is to be upheld. I conclude that Act 23 does not meet this standard.
¶ 94. In contrast to my approach, the majority opinion makes a radical departure from the well-established Anderson/Burdick framework. This is because instead of balancing the benefits and burdens of Act 23 as the Anderson/Burdick framework instructs and reaching the conclusion compelled by the record, the majority intervenes to lessen the severity of the burden by crafting a remedy that allows for individuals to obtain a certified copy of their birth certificate, a document necessary to obtain a free voter identification card, free of charge. Furthermore, the majority opinion's remedy reworks the framework in which Act 23 operates, which is not the court's role. It is the legislature and not this court that must craft a constitutional voter identification law considering the framework in which that law operates, policy objectives, and budgetary constraints. For these reasons, I respectfully dissent.
I. THE MODIFIED FACIAL CHALLENGE APPROACH
¶ 95. The majority opinion asserts that it is addressing a purely facial challenge to Act 23.[21] The majority's analysis, however, reveals that it is not actually doing so. We have consistently said that a purely facial challenge to a law may succeed only when the challenger proves that the law cannot be constitutionally applied under any circumstance.[22] Because Act 23 imposes a minimal burden on eligible Wisconsin voters *517 who already possess an approved form of identification, the law would survive a purely facial challenge on that basis alone. However, the challenge before this court is not purely facial. Instead, it is better understood and analyzed as a modified facial challenge.
¶ 96. In certain contexts, the United States Supreme Court has recognized the existence of a modified approach to facial challenges.[23] "Our cases recognize a second type of facial challenge in the First Amendment context under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.' "[24]
¶ 97. The United States Supreme Court used this type of analysis in Citizens United v. Federal Election Commission, 558 U.S. 310, 333-35 (2010). There, the Court reasoned, "In the exercise of its judicial responsibility, it is necessary then for the Court to consider the facial validity of § 441b. Any other course of decision would prolong the substantial, nationwide chilling effect caused by § 44 lb's prohibitions on corporate expenditures."[25] Essential to the Court's reasoning was that requiring plaintiffs to bring as-applied challenges to the law would cause uncertainty and prolonged litigation, which would not be appropriate considering the importance of speech in the context of elections.[26]
*518 ¶ 98. A discussion of purely facial constitutional challenges and as-applied constitutional challenges demonstrates why the modified facial approach is appropriate in this case. A purely facial challenge requires that the party challenging the law prove, beyond a reasonable doubt, that the law is unconstitutional under all circumstances.[27] "If a challenger succeeds in a facial attack on a law, the law is void 'from its beginning to the end.' "[28] Furthermore, in considering a purely facial constitutional challenge, we presume that the law is constitutional.[29]
¶ 99. An as-applied challenge, in contrast, determines whether a law violated the constitutional rights of a particular person under the facts presented.[30] "Under such a challenge, the challenger must show that his or her constitutional rights were actually violated. If a challenger successfully shows that such a violation occurred, the operation of the law is void as to the party asserting the claim."[31] Therefore, in an as-applied challenge, a court should not presume that the statute has been applied in a constitutional manner.[32]
¶ 100. The majority opinion's claim that it is treating this challenge as a purely facial challenge *519 upsets the well-drawn distinction between purely facial and as-applied challenges. Treating this as a purely facial challenge is not appropriate because the plaintiffs do not actually allege that Act 23 is unconstitutional under all applications. They acknowledge that the photo identification requirements of the law could be constitutionally applied to any eligible Wisconsin voter who already possesses Act 23-compliant identification.[33] Instead of making a purely facial challenge, the plaintiffs argue that Act 23 presents a severe burden on a substantial number of eligible voters.
¶ 101. Similarly, because the challenge here alleges a potential burden to hundreds of thousands of eligible voters,[34] it is inappropriate to require that each affected individual bring an as-applied challenge. While the exact number of individuals without identification *520 who would be substantially burdened or unable to obtain identification is not established, requiring an as-applied approach would mean that each burdened individual or group of individuals would have to challenge Act 23 separately. This would lead to an unnecessarily large volume of litigation that would take a substantial amount of time and resources to conclude. Requiring that individuals bring as-applied challenges would perpetuate uncertainty about the application of the law to different groups and could strip individuals with unresolved but meritorious cases of the right to vote at election time.
¶ 102. This court should look to the United States Supreme Court's modified facial challenge approach, which stems from the First Amendment overbreadth doctrine because it fits equally well in the election regulation context. As I have previously discussed, this approach makes sense because of the problems associated with treating the plaintiffs' challenge to Act 23 as either a purely facial challenge or as an as-applied challenge.
¶ 103. In addition to these practical reasons, a modified facial challenge approach to laws that allegedly burden the right to vote is justified because of the importance of the right as well as theAnderson/Burdick framework in which voting regulations are analyzed.[35] When a voting regulation is challenged as unconstitutional because of an alleged chilling effect on a large number of eligible voters, the challengers should not be required to prove that the law is invalid in all circumstances. This is due to the significance of the right, which requires a court to fully consider the challenge *521 and the record before it to carefully and fully analyze the voting restriction under the Anderson/Burdick framework, which, depending on the severity of the burden imposed, may require the use of a heightened level of scrutiny. In other words, a purely facial challenge approach is unnecessarily rigid and simply does not recognize the fundamental importance of the right to vote. Therefore, under a modified facial challenge approach, I evaluate whether a substantial number of Act 23's applications are unconstitutional "judged in relation to the statute's plainly legitimate sweep."[36]
II. PROPER APPLICATION OF THE ANDERSON/BURDICK BALANCING TEST
¶ 104. I agree with the majority opinion[37] that the plaintiffs' challenge to Act 23 must be evaluated under the balancing test set forth in Anderson[38] and Bur-dick.[39] Under the Anderson/Burdick test, a court addressing a constitutional challenge to a voting regulation weighs the benefits and the burdens of the particular regulation at issue.[40] Not all voting regulations are subject to strict scrutiny.[41] Instead, the level of judicial scrutiny that a court applies to a challenged voting regulation depends on the severity of the burden imposed by that regulation.[42] Therefore, a court must first consider the burden imposed by the voting regulation under review. A voting regulation that imposes a severe burden is constitutional only if it is narrowly *522 tailored to achieve a compelling state interest.[43] On the other hand, a voting regulation that does not impose a severe burden on voters will be found constitutional as long as it is reasonably related to a governmental interest.[44]
¶ 105. Although the majority opinion cites to the Anderson/Burdick balancing test,[45] it does not engage in a straightforward application of the framework. Rather, instead of directly discussing the cost burden imposed by Act 23, as evidenced by the record, it unnecessarily considers whether the fees associated with obtaining a certified copy of a Wisconsin birth certificate, a requirement to obtain a free identification card for voting purposes, function as an unconstitutional poll tax.
¶ 106. The discussion of poll tax case law is misplaced for two reasons. First, the plaintiffs did not challenge Act 23 as an unconstitutional de facto poll tax; therefore, this issue was not briefed or argued by the parties. Second, and more importantly, the plaintiffs' challenge, brought under the Anderson/Burdick framework, requires this court to carefully evaluate the cost burden that Act 23 places on eligible voters. The Anderson/Burdick framework, rather than poll tax *523 analysis, is appropriate because the photo identification requirements at issue are related to election qualifications.[46] In contrast, poll tax analysis is appropriate when the cost imposed on voters is not related to voter qualifications.[47] By evaluating the cost burden through the framework of poll tax cases, the majority opinion conflates two separate types of analysis and fails to consider sufficiently the cost burdens, which are well-established by the record, under the Anderson/Burdick balancing test. Although the majority concludes that the costs associated with obtaining Act 23-compliant identification impose an unconstitutional de facto poll tax that results in a severe burden, it improperly crafts a remedy, which purports to alleviate the burden by eliminating the cost of certified Wisconsin birth certificates under some circumstances. This remedy allows the majority to conclude that the burdens of Act 23 are minimal. By applying poll tax analysis and by crafting this remedy in the midst of the Anderson/Burdick framework, the majority has unnecessarily muddled an otherwise straightforward and tested analytical framework.
¶ 107. Even if I were to assume that poll tax analysis applied to this case, I am not persuaded that the majority opinion's remedy cures the unconstitutionality of Act 23. Anyone who thinks Act 23's constitutional problem is that it creates a de facto poll tax should want to guarantee that such a de facto poll tax is not imposed on any eligible voter. The majority concludes that Act 23 imposes a de facto poll tax; however, there is no support in the law for the proposition that a court may leave to *524 the discretion of a governmental agency whether to approve an exception to a poll tax. If the majority leaves in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is required for supporting documents,[48] it fails to guarantee constitutional protections against poll taxes. Such an approach also leaves the potential for future litigation brought by individuals who were denied the exception. This leaves the constitutionality of Act 23 unsettled unless the legislature acts to repair this defect.
¶ 108. If, however, the majority opinion is requiring DMV administrators to issue photo identification to individuals who cannot afford to obtain underlying documentation,[49] it is directing a non-party to take specific action, which it cannot do.
¶ 109. Therefore, rather than relying on the majority opinion's poll tax analysis, I would apply the well-established Anderson/Burdick framework, which requires the conclusion that Act 23 places a severe burden on a substantial number of eligible Wisconsin voters. The severity of the burden dictates that this court may uphold Act 23 only if it is narrowly tailored to achieve a compelling governmental interest. The record demonstrates that Act 23 is not narrowly tailored to the state's goals of reducing voter fraud or increasing the public's confidence in elections because the Act is unlikely to further either of these goals in any meaningful way. Therefore, Act 23 is unconstitutional.
*525 A. THE BURDENS IMPOSED BY ACT 23 ARE SEVERE
¶ 110. The plaintiffs allege that the costs, time, and effort associated with obtaining an Act 23-compliant form of identification impose a significant burden on a substantial number of eligible Wisconsin voters. I agree with the circuit court that these burdens are severe.
1. A SUBSTANTIAL NUMBER OF ELIGIBLE WISCONSIN VOTERS LACK
ACT 23-COMPLIANT IDENTIFICATION
¶ 111. The circuit court found that "[a] reasonable, reliable and accurate estimate of the number of people eligible to vote in Wisconsin who do not have a form of identification that would permit them to vote under Act 23 is 333,276."[50] Before reaching this conclusion, the circuit court heard the expert testimony of Professor Kenneth R. Mayer, the plantiffs' expert, as well as the testimony of Professor M.V Hood and Dr. Peter Morrison, who both served as expert witnesses for the state.
¶ 112. The circuit court found Professor Mayer and Professor Hood to be qualified experts in terms of establishing the number of eligible Wisconsin voters who lack Act 23-compliant identification. In contrast, the circuit court did not find Dr. Morrison qualified to give expert testimony on the number of eligible voters *526 in Wisconsin lacking Act 23-compliant identification. Although the circuit court considered the testimony of both Professor Mayer and Professor Hood, the circuit court ultimately relied on Professor Mayer's expert testimony.
¶ 113. As the majority opinion correctly states, this court will uphold a circuit court's findings of fact unless they are clearly erroneous.[51] The circuit court's reliance on Professor Mayer's estimate that 333,276 eligible Wisconsin voters lack Act 23-compliant identification was not clearly erroneous.
¶ 114. Professor Mayer utilized the "exact-match" method to estimate the number of registered voters who lacked Act 23-compliant identification. Under this method, Professor Mayer matched the records of registered voters appearing in the Statewide Voter Registration System (SVRS), maintained by the Government Accountability Board (GAB), with records of individuals listed as having either a Wisconsin driver's license or a Wisconsin identification card in a Department of Transportation (DOT) database. The comparison of the SVRS database with the DOT database allowed Professor Mayer to form an initial estimate of the total number of registered voters who lack two of the primary forms of Act 23-compliant identification. Professor Mayer also estimated the number of non-registered, but otherwise eligible, voters who lacked proper identification and the number of individuals who possessed student, tribal, or military identification that would allow them to vote under Act 23.
*527 ¶ 115. Professor Mayer's estimates controlled for individuals who appeared in the DOT database but who had either moved out of state or who had passed away. For example, he utilized census data from the American Community Survey (ACS) to estimate that 277,000 individuals listed as having a Wisconsin driver's license in DMV records had moved out of state. Professor Mayer also relied on a sample of obituaries and the rate at which licenses and identification cards expire each year to determine that approximately 114,690 individuals listed in the DOT database as having photo identification are actually deceased. Finally, Professor Mayer removed duplicate listings of individuals who appeared in the DOT database as having both a driver's license and a state identification card.
¶ 116. Professor Mayer presented clear and concise testimony that relayed his expert report findings to the circuit court. These findings pointed out a variety of imperfections with the DOT database upon which Professor Mayer and Professor Hood relied. In contrast to Professor Mayer, Professor Hood was unable to provide an estimate of the number of eligible Wisconsin voters who lack Act 23-compliant identification. In reference to relying on Professor Mayer instead of Professor ■ Hood, the circuit court logically explained that Professor Hood did not "adequately explain or justify [his] conclusion that the Wisconsin data available, when evaluated using the 'exact [m]atch' method was not sufficiently reliable to estimate the number of eligible voters who lack the required Photo ID."
¶ 117. Furthermore, the circuit court was not clearly erroneous in finding that the state's other expert witness, Dr. Morrison, did not "possess sufficient training or experience to prepare or to offer reliable expert testimony as to election procedures generally nor, spe *528 cifically, the proportion of persons eligible to vote in Wisconsin who lack a Photo ID required by Act 23." The circuit court identified several problems with Dr. Morrison's testimony. These included Dr. Morrison's failure to consider a "significant source of relevant, reliable information, the SRVS listing of eligible Wisconsin voters" and his failure to "recognize or take into account the limitations of the WisDOT data."
¶ 118. Although the circuit court found that an estimated 333,276 eligible Wisconsin voters do not possess Act 23-compliant identification, this finding alone does not indicate the severity of the burden that individuals would face in obtaining a compliant form of identification. However, the record provides ample evidence of the severity of the burden Act 23 imposes.
2. THE COST INCURRED BY ELIGIBLE WISCONSIN VOTERS OBTAINING
ACT 23-COMPLIANT IDENTIFICATION IMPOSES A SERVERE BURDEN
¶ 119. The most significant burden that Act 23 imposes on individuals lacking Act 23-compliant identification is the cost burden that results from the administrative framework in which Act 23 operates. As the majority opinion explains, typically, an individual must produce a certified copy of his or her birth certificate, among other documents, to receive a no-cost identification card for voting purposes.[52] The legislature has dictated, under the current administrative framework, that a certified copy of a Wisconsin birth certificate costs $20.[53] The majority concludes that the $20 cost of a certified Wisconsin birth certificate functions as an unconstitutional fee or poll tax that imposes *529 a severe burden.[54] However, this conclusion unnecessarily muddles poll tax analysis with the Anderson/ Burdick framework. In addition, the majority opinion does not fully address the cost burden imposed on eligible Wisconsin voters who need to obtain a birth certificate from another state to obtain photo identification for voting purposes. Finally, the majority opinion does not consider the severity of the burden that Act 23 places on naturalized citizens who are eligible to vote in Wisconsin.[55] In sum, the majority's remedy does not relieve the cost burden placed on eligible Wisconsin voters born in other states or countries.
¶ 120. The circuit court found that "[t]he cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a substantial burden which falls most heavily upon low income individuals."[56] The circuit court's finding is supported by the record; therefore, it is not clearly erroneous.
¶ 121. The circuit court specifically noted the cost burden that Act 23 imposed upon several different individuals in its decision and order. For example, the *530 experiences of Ruthelle R. Frank and Ricky T. Lewis indicate that they would be forced to incur significant costs to correct errors in their birth certificates to obtain Act 23-compliant photo identification. At the time Lewis sought photo identification, his affidavit indicated that his sole income is his fixed veteran's pension of $986 per month and that he has no savings.[57] He stated that his attempts to obtain identification have resulted in what he considered to be "substantial costs." Additionally, the circuit court noted that Sequoia Cole's only income is $600 per month in Social Security benefits, and in her deposition she stated that the $20 fee for a birth certificate was a burden.
¶ 122. The record also contains numerous affidavits and depositions from individuals regarding the cost burden that Act 23 imposes. The majority of these individuals have low incomes. For example, Ndidi Brownlee's deposition indicates that she has no savings and that she lives month to month on her income. Johnnie Garland's affidavit states that she relies on Social Security benefits that total $678 per month to cover her essential expenses and that she was required to pay $28 to obtain her birth certificate from another state. Kristen Green was unemployed at the time she obtained photo identification, and her deposition indicates that she could not afford the extra bus fare she needed to travel to a DMV office. Danettea Lane's affidavit indicates that she had to pay $20 to obtain her birth certificate and that she supports herself and her four children on $608 per month. In addition, Willie Watson and Eldridge King both indicated in their depositions that they lived on fixed amounts of $683 per month and $1000 per month, respectively.
*531 ¶ 123. In Frank v. Walker, the United States District Court for the Eastern District of Wisconsin recently considered a challenge to Act 23 brought under the Fourteenth Amendment and the Federal Voting Rights Act.[58] While I do not rely on the district court's analysis in Frank, the similarities between the Frank case and this case make many of the district court's findings quite persuasive. In Frank, the district court made persuasive findings in regard to the cost burden that Act 23 imposes.[59] Like the circuit court in this case, the district court considered the testimony of individuals lacking Act 23-compliant photo identification to conclude that the cost burden imposed by the Act is severe.[60] The district court concluded,
[I]n light of the evidence presented at trial, it is also clear that for many voters, especially those who are low income, the burdens associated with obtaining an ID will be anything but minor. Therefore, I conclude that Act 23 will deter a substantial number of eligible voters from casting a ballot."[61]
¶ 124. Based on the record in this case, which is remarkably similar to the record before the district court in Frank, it was not clearly erroneous for the circuit court to conclude that Act 23 places severe cost burdens on a substantial number of eligible Wisconsin voters who lack Act 23-compliant identification.
*532 3. THE TIME AND EFFORT NECESSARY TO OBTAIN ACT 23-COMPLIANT
IDENTIFICATION CONTRIBUTES TO THE SEVERITY OF THE BURDEN
¶ 125. Contrary to the majority opinion, I conclude that the time spent and difficulties encountered by individuals trying to obtain Act 23-compliant identification are significant and contribute to the severity of the burden.[62] The fact that the majority of the plaintiffs in this case eventually obtained a photo identification card for voting purposes does not mean that no burden exists.[63] This is because the burden analysis requires the court to consider the time spent, the obstacles encountered, and the costs paid in obtaining the identification, and not merely the end result of these efforts.
¶ 126. Here, the circuit court found, "Procuring a DMV Photo ID can easily be a frustrating, complex, and time-consuming process." It further concluded that "[t]he cost and the difficulty of obtaining documents necessary to apply for a DMV Photo ID is a significant burden upon the opportunity of Wisconsin citizens to vote."
¶ 127. The circuit court relied on affidavits and depositions from numerous individuals who described the time spent and difficulties incurred in obtaining or attempting to obtain Act 23-compliant identification. In its decision and order, the circuit court specifically relied upon the experiences of Ruthelle R. Frank and Ricky T. Lewis who each had frustrating experiences in attempting to obtain photo identification. Errors on birth certificates caused this difficulty and prevented *533 both individuals from obtaining photo identification. Lewis estimated in his deposition that he spent 10 to 15 hours attempting to obtain identification. The circuit court also relied upon the experiences of Sequoia Cole, Brittany Cramer, and Joel Torres who all explained that obtaining photo identification took a substantial amount of time — up to 6.5 hours in one case. A majority of the individuals cited by the circuit court made multiple trips to DMV service centers and other state agencies in attempting to obtain Act 23-compliant photo identification.
¶ 128. In addition to the individuals cited in the circuit court's decision, the record also contains a number of other affidavits and depositions that describe the time and difficulty burden that Act 23 imposes. For example, Ndidi Brownlee spent several hours traveling to and then waiting at the DMV Cheryl Edwards' affidavit states that she spent roughly nine hours assisting family members who needed to obtain photo identification for voting purposes. Kristen Green's affidavit indicates that she made multiple trips to the DMV to obtain photo identification and that her combined trips totaled almost five hours. Danettea Lane's affidavit states that she spent nearly 10 hours during the process of obtaining identification. Mary McClintock, who uses a wheelchair, was required to arrange special transportation and spent approximately nine hours in the process of obtaining identification. The record also reflects that Jennifer Platt's trip to the DMV took three hours. Speciall Simmons stated in his affidavit that it took him three hours to obtain identification. Willie Watson spent approximately four hours arranging transportation that would allow him to apply for identification. John Wolfe's affidavit and deposition testimony indicated that the closest DMV was 30 to 40 miles out of his way.
*534 ¶ 129. As the previous discussion demonstrates, the record fully supports the circuit court's conclusions pertaining to the time, effort, and difficulty burdens. Therefore, the circuit court's determination that the difficulties imposed by Act 23 result in a severe burden was not clearly erroneous.
¶ 130. In coming to the opposite conclusion, the majority opinion notes that photo identification is part of the reality of daily life.[64] This may be true; however, that does not diminish the burdens that Act 23 imposes on individuals who accomplish their daily responsibilities without any form of photo identification that would meet the requirements of Act 23. In Frank, the United States District Court for the Eastern District of Wisconsin addressed the impact that Act 23 has on individuals who currently conduct their daily lives without any form of Act 23-compliant identification.[65] The district court stated,
[A] person whose daily life did not require possession of a photo ID prior to the imposition of the photo ID requirement is unlikely to derive any benefit from possessing a photo ID other than the ability to continue voting. Yet that person must pay the same costs — -in the form of the hassle of obtaining the underlying documents and making a trip to the DMV — as the person who obtained the ID for driving.[66]
¶ 131. The district court in Frank, relying on the testimony of numerous individuals lacking Act 23-compliant identification, also specifically considered the time and difficulty burden imposed by Act 23. In doing *535 so, it considered the number of DMV service centers in the state and noted that only two centers in the entire state are open past 5 p.m. and that only one DMV service center in the state is open on the weekend.[67] This fact led the district court to conclude that individuals will likely have to take time off of work and forfeit hourly wages to obtain a voter identification card from a DMV center during business hours.[68] If an individual is required to obtain underlying documents from other state agencies, then the amount of time and lost wages increases.[69]
¶ 132. The district court also heard testimony that indicated that not all DMV centers are accessible by public transportation.[70] In reaching its conclusion that Act 23 imposes severe burdens on individuals, it considered these transportation difficulties especially in light of low-income Wisconsin residents who rely primarily on public transportation.[71]
¶ 133. The majority opinion's reliance on the Crawford[72] decision's discussion of the time required and other obstacles faced, such as "life's vagaries,"[73] fails to convince me that the circuit court’s findings were clearly erroneous. The majority opinion cites to *536 Crawford for the proposition that trips to the DMV and other difficulties suffered to obtain a voter identification card cannot constitute a severe burden.[74] However, the majority opinion's selective reliance on portions of Crawford ignores the fact that the United States Supreme Court was satisfied that the affidavit exception[75] to Indiana's voter ID law alleviated some of the burdens of "life's vagaries."[76] In addition, the majority opinion ignores the following language from Crawford,
Both evidence in the record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons. They include elderly persons born out of State, who may have difficulty obtaining a birth certificate; persons who because of economic or other personal limitations may find it difficult either to secure a copy of their birth certificate or to assemble the other required documentation to obtain a state-issued identification; homeless persons; and persons with a religious objection to being photographed. If we assume, as the evidence suggests, that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote.[77] _
*537 ¶ 134. In sum, both the record in this case and the Frank decision support the circuit court's finding that the time, effort, and difficulty burden that Act 23 imposes is severe.
B. ACT 23 IS NOT NARROWLY TAILORED TO ACHIEVE ANY COMPELLING STATE INTEREST
¶ 135. The circuit court's finding that Act 23 places a severe burden on a substantial number of eligible Wisconsin voters who lack Act 23-compliant identification must be upheld; therefore, the Act is constitutional only if it is narrowly tailored to achieve a compelling state interest.[78]
¶ 136. The state asserts that Act 23 has two primary and compelling benefits: the reduction of voter fraud and the increase of voter confidence in the outcome of elections. In considering these alleged benefits, the circuit court found that "[t]he Photo ID requirements of Act 23 are unlikely to protect the electoral process" and "[t]he Photo ID requirements of Act 23 are not narrowly tailored to achieve a goal of voter verification." Specifically, the circuit court found,
Since 2004, voter fraud investigations have been undertaken by the Milwaukee Police Department, by the Mayor of Milwaukee and by the Wisconsin Department of Justice, working with various county prosecutors *538 working through the Attorney General's Election Fraud Task Force. None of these efforts have produced a prosecution of a voter fraud violation that would have been prevented by the voter ID requirements of Act 23.
¶ 137. Finally, in referencing voter fraud and summarizing its holding, the circuit court stated,
Act 23 addresses a problem which is very limited, if indeed it exists. It does not appear to recognize or to account for the difficulty its demands impose upon indigent and elderly citizens who are eligible under the constitution to vote. It offers no flexibility, no alternative to prevent the exclusion of a constitutionally qualified voter. Given the sacred, fundamental interest at issue, it is clear that Act 23, while perhaps addressing a legitimate concern, is not sufficiently narrow to avoid needless and significant impairment of the right to vote. The enactment steps beyond the proper authority of the legislature and is in violation of the Wisconsin Constitution, Article III, Section 1.
The circuit court's findings in regard to the lack of benefits associated with Act 23 and its determination that the Act is not narrowly tailored to achieve these benefits are supported by the record, and thus, are not clearly erroneous; therefore, the circuit court's findings must be upheld.
¶ 138. In regard to the allegation that Act 23 reduces voter fraud, the circuit court heard testimony regarding incidents of voter fraud and considered the current penalties in place to deter voter fraud.[79] One *539 indication that Act 23 is not narrowly tailored to reduce voter fraud is that incidents of voter fraud in general are almost non-existent. An even greater indication that Act 23 is not narrowly tailored to prevent voter fraud is that the photo identification requirements of the Act would not prevent the types of voter fraud that have been uncovered during recent investigations.
¶ 139. The circuit court heard testimony from Professor Mayer regarding a lack of voter fraud in Wisconsin generally as well as a lack of impersonation voter fraud, which Act 23 is most likely to prevent. Professor Mayer based his testimony on academic studies of voter fraud, as well as studies conducted in 2004 and 2008 of voter fraud in Wisconsin. He concluded and testified that "there is virtually no evidence at all that in-person voter impersonation at the polling places occurs with any frequency, if it occurs at all."
¶ 140. Professor Mayer also reviewed incidents of voter fraud detected by a 2008 Department of Justice (DOJ) investigation. The DOJ investigation followed the 2008 presidential election. As a result of the investigation, the State brought charges in 20 cases of election fraud. These charges included eleven cases of felons voting, two double voting cases, six cases of misconduct related to voter registration, and one fraudulent case of absentee voting. This investigation resulted in no charges of impersonation voter fraud.
¶ 141. Professor Mayer testified that the photo identification requirements of Act 23 would not have prevented any of the types of voter fraud identified in *540 the 2008 DOJ investigation. For example, the photo identification requirements of Act 23 would not prevent a felon from voting because any felon with Act 23-compliant photo identification could cast a ballot. In the two cases of double-voting, individuals voted absentee and were also allowed to vote in-person because of poor record keeping. In Professor Mayer's expert opinion, photo identification would not have prevented these two individuals from voting in person, since poll workers had no record that they had already voted absentee. Furthermore, the photo identification requirements of Act 23 would not have prevented the cases of fraudulent voter registration because there is no photo identification requirement to register to vote.
¶ 142. Furthermore, the circuit court found that "a comprehensive study of voter attitudes has found that state photo ID requirements appear to have no effect upon public confidence in the process." In reaching this conclusion, the circuit court relied on Professor Mayer's January 16, 2011, report in which he reviewed the findings of the Cooperative Congressional Election Study (CCES). Professor Mayer's report explains a study of the CCES, which stated, "ID laws will have little or no effect on the confidence in the electoral system or the belief in the incidence of fraud. Those beliefs ... are not different when a stricter ID law is in place and enforced than when less invasive voter-authentication methods are used." There is nothing in the record that disputes Professor Mayer's interpretation of the CCES or the circuit court's finding that Act 23 does not increase voter confidence in election outcomes.
¶ 143. The majority opinion asserts that the "State has a significant and compelling interest in protecting the integrity and reliability of the electoral process, as well as promoting the public's confidence in *541 elections."[80] However, both the majority opinion and the record in this case fail to demonstrate how Act 23's photo identification requirement promotes either of these state interests in any meaningful way. Therefore, I agree with the circuit court's findings that Act 23 is not narrowly tailored to the State's interests of decreasing voter fraud or increasing public confidence in the outcome of elections. The result is that Act 23 is unconstitutional.
III. THE PROPER REMEDY
¶ 144. Consideration of the proper remedy is appropriate after considering the burdens of Act 23, the applicable level of judicial scrutiny, and the benefits of the Act. In the midst of discussing the Anderson/ Burdick framework, however, the majority opinion interprets administrative rules in a way that allows for an exception to the cost of obtaining a certified copy of a birth certificate for some individuals. There is no dispute that a court must determine whether legislation challenged as unconstitutional may be interpreted in a way to avoid invalidation.[81] However, the majority's approach is absolutely contrary to the role of this court and essentially invades the legislative function because it is not actually interpreting Act 23, the challenged legislation, in a way that cures the Act's unconstitutionality. Instead, the majority reaches outside of the challenged legislation and interprets existing administra *542 tive code provisions in its attempt to salvage an unconstitutional Act. This approach results in a direction to an administrative agency that is not a party in this case. The majority cites no authority that supports this novel approach.
¶ 145. The majority opinion directs DMV administrators to deem any document requiring a payment to a government agency "unavailable" for purposes of the Wisconsin Administrative Code § Trans 102.15(3)(b) exception.[82] The majority may also be directing DMV administrators to accept an individual's written petition for the exception.[83] Either approach involves directing a non-party.
¶ 146. The conclusion that the majority opinion cannot direct agency administrators who are non-parties to this case is supported by Wisconsin civil procedure and our case law. For example, Wis. Stat. § 801.05 governs personal jurisdiction and provides that a court has "jurisdiction over a person served in an action . . . ,"[84] This court has explained, *543 In addition, "[i]f a person is not named in a lawsuit, that person is a stranger to the court and cannot be bound by it."[86] These are essential principles governing jurisdiction that the majority opinion fails to consider when directing DMV administrators to take action. The issue of directing a non-party to exercise discretion or to take action is not a "straw man,"[87] but rather it involves basic principles of jurisdiction and civil procedure.
*542 A summons serves two purposes. First, a summons provides notice to the defendant that an action has been commenced against the defendant. Indeed, notice that apprises a party of the pendency of an action against it and affords the opportunity to present objections is regarded as "[a]n elementary and fundamental requirement of due process." Second, consistent with Wis. Stat. §§ 801.05 and 801.11, a summons confers personal jurisdiction on a court over the defendant served.[85]
*543 ¶ 147. The majority's approach is also inconsistent with how courts typically interact with administrative agencies. For example, courts tasked with reviewing agency actions must adhere to strict statutory guidelines that allow the court to maintain subject matter jurisdiction.[88] No court, including our court, has any authority to direct action by an administrative agency unless that court has jurisdiction to do so. We have no jurisdiction to act here as the majority attempts to do so.
¶ 148. Contrary to the majority opinion, I conclude that the appropriate remedy is invalidation of Act 23. If the legislature chooses, it may enact a constitutional version of Act 23 considering the administrative framework in which the Act functions — that is, one that does not severely burden any eligible Wisconsin voter. To avoid the unconstitutionality of the majority's remedy and put in place a voter identification law that is unquestionably enforceable, the legislature should look to Indiana's voter identification law, which the United *544 States Supreme Court upheld in Crawford. A clear legislative directive preserves the essential separation of legislative and judicial powers that the Wisconsin Constitution requires.[89]
¶ 149. Constitutional issues that "are peppered with political perceptions and emotionally laden views" require courts to exercise judicial restraint.[90] This court exercised judicial restraint in the context of public school funding in Kudor v. Grover,[91] and this court should likewise exercise caution in its review of Act 23. This is because voter identification laws such as Act 23 involve highly politicized issues that concern complicated matters of public policy.
¶ 150. In discussing remedy in Frank the district court came to a similar conclusion. The district court remarked,
The plaintiffs suggest that I could order the defendants to allow eligible voters without photo IDs to vote without showing an ID or by signing an affidavit affirming their identities and lack of an ID. However, ordering such relief would be the functional equivalent of enjoining the current law and replacing it with a new law drafted by me rather than the state legislature. . . . To grant this remedy, I would need to make a policy judgment as to whether eligible voters who do not have IDs should be required to sign affidavits of identity before receiving a ballot. And, if I found that an affidavit was required, I would need to decide what language the affidavit should contain. Once I issued this relief, I would have to supervise the state's election- *545 administration officials to ensure that they were properly implementing my instructions. These tasks are outside the limited institutional competence of a federal court, and therefore I may not rewrite the photo ID requirement to conform it to constitutional requirements.[92]
¶ 151. A Wisconsin statute allows unconstitutional portions of laws to be severed under certain circumstances;[93] however, this remedy is not applicable to Act 23. This is because the unconstitutionality of Act 23 is a result of how the law functions within a greater body of administrative rules. In other words, there is no portion of Act 23 that could be severed that would cure the unconstitutionality of the Act.
¶ 152. The United States Supreme Court has explained that courts must avoid judicial legislation and should avoid editing statutory text.[94] Furthermore, the Supreme Court has illuminated three key principles underlying remedies.[95] First, a court should seek to *546 invalidate as little of the legislature's work as possible.[96] Second, a court must refrain from rewriting unconstitutional state laws.[97] Third, a court must consider legislative intent in attempting to salvage an unconstitutional law.[98]
¶ 153. After considering these principles and the inability of this court to sever a specifically unconstitutional portion of Act 23 that would save the law, I conclude that the only applicable remedy is invalidation of Act 23. Act 23 functions within a regulatory framework established by the Wisconsin legislature, which imposes a cost for birth certificates. I agree with the majority opinion that the legislature could eliminate this cost.[99] It could also institute another type of exception to the Act's requirements that could lessen the severity of the burden imposed on certain eligible Wisconsin voters, such as the affidavit exception found in Indiana's voter identification law.[100] However, it is the role of the legislature and not this court to institute such changes to Act 23 or to the framework in which the Act operates. It is unknown whether the majority opinion's remedy will function effectively or how that remedy will be enforced. Finally, the majority opinion's remedy fails to consider policy considerations, budget *547 ary constraints, and legislative intent. It is the legislature and not this court that should address the unconstitutionality of Act 23.
IV CONCLUSION
¶ 154. I cannot agree with the majority opinion's characterization and analysis of the plaintiffs' challenge. The majority incorrectly characterizes the challenge as a purely facial challenge. It fails to apply the Anderson/Burdick framework correctly. It improperly relies on poll tax case law. Even if I were to assume that poll tax analysis applied, the majority's attempt to alleviate the de facto poll tax for some eligible Wisconsin voters results in an unworkable solution that fails to cure the unconstitutionality of Act 23. Specifically, the majority opinion's remedy appears to leave in place the discretion of DMV administrators to issue or refuse to issue Act 23-compliant identification where a fee is required for supporting documents. If the majority opinion leaves in place the discretion of DMV administrators to issue exceptions to those burdened by the cost of obtaining underlying documentation, it fails to guarantee constitutional protections against poll taxes. On the other hand, if the majority opinion requires DMV administrators to issue photo identification cards to individuals who are burdened by the cost of obtaining required underlying documentation, then it is directing a non-party to take specific action, which it has no authority to do. In sum, the remedy imposed by the majority, under either approach, is flawed. Furthermore, its remedy impinges on the legislature's role by interpreting administrative code provisions that are not part of this challenge and by directing an administrative agency that is not a party to this case. I urge the legislature to take action to cure the unconstitutional *548 ity of Act 23. Without such action, the remedy crafted by the majority leaves Act 23 unconstitutional.
¶ 155. The United States Supreme Court's decision in Crawford v. Marion County Election Board,[101] which upheld Indiana's voter identification statute, does not persuade me that Act 23 is constitutional. This is because there are substantial differences between this case and the Crawford case. First, the record in the Crawford case was not nearly as developed as the record in this case. This factor certainty influenced the Supreme Court's decision.[102] Second, Indiana's voter identification statute is not as stringent as Act 23. Most importantly, the Indiana law provides for an affidavit exception that allows certain individuals to vote without photo identification.[103] In upholding Indiana's voter identification law, Justice Stevens' lead opinion commented that the severity of the burden imposed by the photo identification requirement "is, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."[104] Finally, while Act 23 applies to both in-person and absentee voting, Indiana's photo identification requirements do not apply to absentee voting. Therefore, the Crawford case is neither controlling nor persuasive.
*549 ¶ 156. The question of whether Act 23 violates the Wisconsin Constitution is at the intersection of profound democratic principles: the right of qualified Wisconsin citizens to vote, as explicitly guaranteed by the Wisconsin Constitution, and the undisputed principle that the state has a legitimate interest in safeguarding the integrity of elections through regulations. Voter identification provisions are one way the state may choose to protect the legitimacy of elections. Such provisions may be constitutionally imposed even if they severely burden a person's right to vote, as long as they are narrowly tailored to advance a compelling state interest. However, Act 23's photo identification requirements severely burden eligible voters without being narrowly tailored to achieve the state's compelling interests of reducing voter fraud and increasing voter confidence in the outcomes of elections. For that reason, Act 23 is an unconstitutional election regulation, and I therefore respectfully dissent.
¶ 157. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

 The Wisconsin Constitution guarantees the right to vote to qualified citizens. It states, "Every United States citizen age 18 or older who is a resident of an election district in this state is a qualified elector of that district." Wis. Const, art. Ill, § 1.

 Dells v. Kennedy and Others, 49 Wis. 555, 557, 6 N.W. 246 (1880) ("For the orderly exercise of the right [to vote] ... it is admitted that the legislature must prescribe necessary regula *510 tions as to the places, mode and manner, and whatever else may be required to insure its full and free exercise."); State ex rel. Wood v. Baker (Baker), 38 Wis. 71, 86 (1875) ("Statutes cannot impair the right [to vote], though they may regulate its exercise. Every statute regulating it must be consistent with the constitutionally qualified voter's right of suffrage when he claims his right at an election. Then statutes may require proof of the right, consistent with the right itself.").

 The balancing test under which I find Act 23 unconstitutional is addressed in Anderson v. Celebrezze, 460 U.S. 780, 789 (1983), and further discussed by Burdick v. Takushi, 504 U.S. 428, 434 (1992).

 Crawford v. Marion Cnty. Election Bd., 553 U.S. 181 (2008).

 Id. at 200 ("But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden *511 on this narrow class of voters .... [T]he record does not provide us with the number of registered voters without photo identification.").

 Id. at 186 (describing the affidavit procedure available to indigent voters as well as individuals with a religious objection to being photographed).

 Id. at 199.

 Majority op., ¶¶ 19, 21.

 Although the majority sometimes asserts that it does not define the payments at issue as poll taxes, it acknowledges that it interprets Act 23 with this "characterizationO in mind." Id., ¶ 50. Regardless of what the majority calls the costs at issue, it is clear that the majority relies on poll tax jurisprudence.

 Id, ¶¶ 62-63 (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666 (1966)).

 See id., ¶ 63. The majority states, "Copies of other vital records, Wis. Stat. § 69.21, may also have been required. For convenience of discussion, we refer only to birth certificates." See majority op., ¶ 52 n.12. I employ the same term.

 See id., ¶¶ 7 n.5, 70.

 See id., ¶¶ 79-80.

 See id., ¶ 70.

 See id., ¶ 7, ¶ 7 n.5.

 See Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 333-35 (2010) (applying a modified facial challenge approach and concluding, in part, that independent corporate political expenditures cannot be limited under the First Amendment); see also Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008) (applying a modified facial challenge approach and holding that Washington State's primary system did not violate political parties' associational rights under the First Amendment).

 Wash. State Grange, 552 U.S. at 449 n.6 (emphasis added) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

 State v. Wood, 2010 WI 17, ¶ 13, 323 Wis. 2d 321, 780 N.W.2d 63.

 Id.

 Burdick, 504 U.S. at 434 (citing Anderson, 460 U.S. at 788).

 Majority op., ¶¶ 19, 21.

 Wood, 323 Wis. 2d 321, ¶ 13. United States v. Salerno, 481 U.S. 739 (1987), first established this approach to the evaluation of a purely facial constitutional challenge.

 See Wash. State Grange, 552 U.S. at 449 n.6 (discussing First Amendment overbreadth doctrine); see also Sabri v. United States, 541 U.S. 600, 609-10 (2004) (listing cases in which the United States Supreme court applied a modified or relaxed facial analysis).

 Wash. State Grange, 552 U.S. at 449 n.6 (quoting Broadrick, 413 U.S. at 615).

 Citizens United, 558 U.S. at 333.

 Id. at 333-35.

 Wood, 323 Wis. 2d 321, ¶¶ 13, 15.

 Id., ¶ 13 (quoting State ex rel. Comm'rs of Pub. Lands v. Anderson, 56 Wis. 2d 666, 672, 203 N.W.2d 84 (1973)).

 See id., ¶ 15.

 Id., ¶ 13.

 Id.

 This statement is supported by Tammy W-G. v. Jacob T, 2011 WI 30, ¶ 49, 333 Wis. 2d 273, 797 N.W.2d 854, in which we stated, "[T]he analysis that is employed for an as-applied challenge contains no presumption in regard to whether the statute was applied in a constitutionally sufficient manner." Similarly, we have explained that "[w]hile we presume a statute is constitutional, we do not presume that the State applies *519 statutes in a constitutional manner." Soc'y Ins. v. Labor & Indus. Review Comm'n, 2010 WI 68, ¶ 27, 326 Wis. 2d 444, 786 N.W.2d 385.
In the context of the modified facial challenge approach, some scholars have suggested the presumption of constitutionality that applies to purely facial challenges has no application to the First Amendment overbreadth doctrine. Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev. 235, 261-283 (1994) ("Thus, when the court considers the overbreadth challenge, applying the Salerno presumption entails judging the litigant by an unconstitutional rule of law- — • unconstitutional because, at least for the time being, it chills the behavior of third parties.").

 The circuit court found that "[t]he majority of Wisconsin voters, some 80%, possess a driver's license that meets the Photo ID requirements of Act 23." This means that Act 23 operates constitutionally in regard to the approximately 80% of Wisconsin voters who face little or no burden in complying with the law's identification requirements.

 The circuit court found that approximately 333,276 eligible voters in Wisconsin lack identification that would comply with Act 23.

 See Dorf, supra note 32, at 264-68 (discussing the potential application of the overbreadth doctrine to all fundamental rights).

 See Wash. State Grange, 552 U.S. at 449 n.6.

 Majority op., ¶¶ 27-34, 40.

 Anderson, 460 U.S. 780.

 Burdick, 504 U.S. 428.

 Anderson, 460 U.S. at 789.

 See Burdick, 504 U.S. at 433.

 Id. at 434.

 Id.

 See id. (citing Anderson, 460 U.S. at 788). The Anderson/Burdick test, which I apply, is consistent with this court's precedent. Prior Wisconsin Supreme Court cases that have evaluated election regulations have not identified the level of scrutiny that this court should apply, nor do these cases directly engage in a balancing test. More typically, this court has considered whether the election regulation under review was reasonable. See also State ex rel. Van Alstine v. Frear, 142 Wis. 320, 337, 125 N.W 961 (1910) (citing State ex rel. Runge v. Anderson, 100 Wis. 523, 533-34, 76 N.W. 482 (1898)); Baker, 38 Wis. at 87.

 Majority op., ¶¶ 27-34, 40.

 See League of Women Voters v. Walker, 2014 771 97, ¶¶ 4-5, 357 Wis. 2d 360, 851 N.W.2d 302.

 See Crawford, 553 U.S. at 189; see also Harper, 383 U.S. at 670.

 See majority op., ¶¶ 67, 70.

 See majority op., ¶ 7, ¶ 7 n.5.

 The circuit court opinion carefully explained how it came to this conclusion and described the data upon which it relied. In reviewing this data, it appears that a mathematical error occurred and that the number of estimated eligible Wisconsin voters who lack Act 23-compliant identification should be 333,296.

 Majority op., ¶ 21 (citing State v. Arias, 2008 WI 84, ¶ 12, 311 Wis. 2d 358, 752 N.W.2d 748).

 See majority op., ¶ 52 n.12.

 Id., ¶¶ 14, 61; Wis. Stat. § 69.22(l)(a),(c).

 Majority op., ¶ 62.

 One form of Act 23-compliant identification includes a certificate of naturalization issued "not earlier than 2 years before the date of an election at which it is presented." Wis. Stat. § 5.02(6m)(b). This means that a certificate of naturalization that is more than two years old cannot be used as a compliant form of identification at the polls under Act 23. Therefore, it appears that a naturalized citizen may be required to obtain another form of Act 23-compliant identification, which in some cases could require foreign-born individuals to obtain a foreign certificate of birth.

 The amicus curiae briefs submitted by AARP and Disability Rights Wisconsin provide convincing arguments that Act 23 disproportionally burdens Wisconsin residents over the age of 65 and Wisconsin residents with disabilities, respectively.

 The circuit court later stated that Lewis' monthly income was $1021, which it based on his deposition.

 Frank v. Walker, 17 F. Supp. 3d 837 No. 2011-CV-1128, slip op. at 1 (E.D. Wis. Apr. 29, 2014).

 Id. at 31-34. Seven of the eight people who testified in Frank are low-income individuals and an expert witness who testified at that trial established that "[a] substantial number of the 300,000 plus eligible voters who lack a photo ID are low-income." Id. at 24.

 Id. at 37.

 Id.

 See majority op., ¶¶ 41-48.

 See id., ¶ 42.

 Id, ¶ 44.

 Frank v. Walker, 17 F. Supp. 3d 837 No. 2011-CV-1128, slip op. at 11 (E.D. Wis. Apr. 29, 2014).

 Id

 Id. at 30. The amicus brief submitted by Institute for One Wisconsin similarly explains that "the DMV services centers are open for limited hours. Indeed, 41 are open just two days each week, seven are open just a few hours for one day each month, and three are open just one day every quarter."

 Id

 Id. at 31.

 Id. Disability Rights Wisconsin's amicus brief also notes transportation difficulties for eligible Wisconsin voters living with disabilities as well as eligible voters living in rural areas.

 Id. at 30.

 553 U.S. 181 (2008).

 Majority op., ¶ 43.

 1d.

 The Indiana voter identification law provides that "[a] voter who is indigent or has a religious objection to being photographed may cast a provisional ballot that will be counted only if she executes an appropriate affidavit before the circuit court clerk within 10 days following the election." Crawford, 553 U.S. at 186 (2008) (citing Ind. Code Ann. §§ 3-11.7-5-1 (West Supp. 2007), 3-11.7-5-2.5(c) (West 2006)). In contrast to the Indiana voter identification law, Act 23 provides no such affidavit exception.

 Id. at 197-98.

 Id. at 199 (emphasis added) (footnote omitted).

 Burdick, 504 U.S. at 434. As previously discussed, the majority opinion interprets administrative rules to craft a remedy that attempts to reduce the burden placed on voters. This does not follow from the Anderson/Burdick framework. Because of the majority opinion's approach, it concludes that rational basis scrutiny applies. See majority op., ¶¶ 72-80 (discussing the benefits of Act 23).

 Wisconsin statutes criminalize voter fraud as Class I felonies and impose penalties of up to 3.5 years in prison or up to a $10,000 fine, or both. See Wis. Stats. §§ 12.13 (governing various forms of election fraud), 12.60 (detailing the penalty structure for crimes related to election fraud), 939.50 (outlining the classification structure of felonies). In reference to the strict *539 penalties imposed on fraudulent voting, the district court in Frank stated, "As the plaintiffs' unrebutted evidence shows, a person would have to be insane to commit voter-impersonation fraud." Frank v. Walker, 17 F. Supp. 3d 837 No. 2011-CV-1128, slip op. at 8 (E.D. Wis. Apr. 29, 2014).

 Majority op., ¶ 73 (citing Crawford, 553 U.S. at 196).

 See Crowell v. Benson, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

 Majority op. ¶¶ 69-70.

 Majority op., ¶¶ 7, 7 n.5, 70.

 Wis. Stat. § 801.05.

 Johnson v. Cintas Corp. No. 2, 2012 WI 31, ¶ 24, 339 Wis. 2d 493, 811 N.W.2d 756 (citations omitted).

 Bulik v. Arrow Realty, Inc. of Racine, 148 Wis. 2d 441, 444, 434 N.W.2d 853 (Ct. App. 1988).

 Majority op., ¶ 71 n.17.

 See Wis. Stat. § 227.53; see also Schiller v. DILHR, 103 Wis. 2d 353, 355, 390 N.W.2d 5 (Ct. App. 1981) (citing Kegonsa Joint Sanitary Dist. v. City of Stoughton, 87 Wis. 2d 131, 274 N.W.2d 598(1979)).

 Wagner Mobil, Inc. v. City of Madison, 190 Wis. 2d 585, 594 n.4, 527 N.W.2d 301 (1995).

 Kukor v. Grover, 148 Wis. 2d 469, 504, 436 N.W.2d 568 (1989) (addressing a constitutional challenge to public school funding).

 Id

 Frank v. Walker, 17 F. Supp. 3d 837 No. 2011-CV-1128, slip op. at 39 (E.D. Wis. Apr. 29, 2014).

 Wis. Stat. § 990.001 states, "In construing Wisconsin laws the following rules shall be observed unless construction in accordance with a rule would produce a result inconsistent with the manifest intent of the legislature: . . .." Subsection (11) provides,
The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application.

 United States v. Nat'l Treasury Emps. Union, 513 U.S. 454, 478-79 (1995).

 Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320, 329 (2006).

 Id.

 Id.

 Id. at 330.

 Majority op., ¶ 62.

 See Crawford, 553 U.S. at 186, 199 (discussing the affidavit exception to Indiana's voter identification law). Specifically, part of the affidavit exception to Indiana's voter identification law allows provisional ballots cast by indigent voters to be counted if the voter "executes an affidavit before the circuit court clerk or county election board" in accordance with statutory requirements. Ind. Code Ann. § 3-11.7-5-2.5 (West 2011).

 Crawford, 553 U.S. 181.

 Id. at 200 ("But on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden on this narrow class of voters .... [T]he record does not provide us with the number of registered voters without photo identification . . . .").

 Id. at 186 (describing the affidavit procedure available to indigent voters as well as individuals with a religious objection to being photographed).

 Id. at 199.